# UNITED STATES *v.* AMERICAN BELL TELEPHONE COMPANY.

### APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MASSACHUSETTS.

No. 846.  Argued October 9, 10, 1888. — Decided November 12, 1888.

A bill in equity which assails two patents, issued nearly a year apart, but to the same party, and relating to the same subject, both held by the same corporation defendant, and used by it in the same operations, is not multifarious.

Where a patent for a grant of any kind, issued by the United States, has been obtained by fraud, by mistake, or by accident, or where there is any error in the patent itself capable of correction, a suit by the United States against the patentee is the appropriate remedy for relief.  This proposition is supported by precedents in the High Court of Chancery of England, and in other courts of that country.

The more usual remedy, under the English law, to repeal or revoke a patent, obtained by fraud from the King, was a writ of *scire facias*, returnable either into the Court of King's Bench or of Chancery; though it has been said that the jurisdiction of the Court of Chancery arises, not from its general jurisdiction to give relief for fraud, but because the patents issuing from the King were kept as records in the petty-bag office of that court.  The case, however, of *The Attorney General* v. *Vernon*, 1 Vernon, 277, and other cases seem to indicate that, by virtue of its general equity powers, the Court of Chancery had jurisdiction to give relief against fraud in obtaining patents.

In England grants and charters for special privileges were supposed to issue from the King, as prerogatives of the Crown; and the power to annul them was long exercised by the King by his own order or decree. This mode of vacating charters and patents gradually fell into disuse; and the same object was obtained by *scire facias*, returnable into the Court of King's Bench, or of Chancery.

In this country, where there is no kingly prerogative, but where patents for lands and inventions are issued by the authority of the government, and by officers appointed for that purpose, who may have been imposed upon by fraud or deceit, or may have erred as to their power, or made mistakes in the instrument itself, the remedy for such evils is by proceedings before the judicial department of the government.

Both the Constitution and the acts of Congress organizing the courts of the United States have, in express terms, provided that the United States may bring suits in those courts; and they are all very largely engaged in

the business of affording a remedy where the United States has a legal right to relief.

The present suit — a bill in Chancery in the Circuit Court of the United States for the District of Massachusetts, wherein the United States are plaintiffs, brought against the defendant to set aside patents for inventions on the ground that they were obtained by fraud — is a proper subject of the jurisdiction of that court, as defined in § 1, c. 37, Act of March 3, 1875, 18 Stat. 470; and is well brought under the direction of the Solicitor General on account of the disability of the Attorney General to take part in the case; and its allegations of fraud and deception on the part of the patentee in procuring the patents are sufficient; if sustained, to authorize a decree setting aside and vacating the patents as null and void.

Section 4920 of the Revised Statutes, which enumerates five grounds of defence to a patent for an invention that may be set up by any one charged with an infringement of the rights of the patentee, was not intended to supersede, nor does it operate as a repeal or withdrawal of the right of the government to institute an action to vacate a patent for fraud.

IN EQUITY. The object of the bill, which was signed by the District Attorney of the United States for the District of Massachusetts, and the Solicitor General, acting in this case as Attorney General, was to obtain the cancellation, avoidance, recall and repeal of the two patents granted to Alexander Graham Bell, which formed the subject of the litigation in *The Telephone Cases*, and which will be found in 126 U. S., at pages 4 and 15, one being numbered 174,465, and dated March 7, 1876; the other No. 186,787, dated January 30, 1877. It was charged that the patents were and each of them was "procured to be issued by means of fraud, false suggestion, concealment and wrong on the part of the said Alexander Graham Bell," and that he and the Telephone Company, which was his assignee, had at all times known and had full knowledge of the alleged frauds and concealment.

It was alleged "that up to the time of the issuing of the said [first] patent, the said Bell had never in fact been able to transmit articulate speech by the method or with the apparatus described in his said application, but that he purposely framed his said application and claim in ambiguous and general terms, in order to cover both antecedent and future inventions, and to deceive and mislead the examiners of the

Patent Office and the public, and did not set forth or declare that his alleged invention had any relation to the art of transmitting articulate speech by means of electricity, but entitled it an application for 'an improvement in telegraphy,' and made special reference to a then recent application made by himself for a patent for a method of 'multiple telegraphy,' and treated his alleged new invention as another method thereof, and set forth advantages which it had over the other, but did not include or mention its capacity, or claim for it any capacity, to transmit speech.

"And your orator further shows and charges that by the means aforesaid the said Bell not only failed to meet the requirements of the statute as to the form of his application, but did in fact mislead and deceive the examining officers of the Patent Office, and did cause them to regard the said alleged invention as a mere improvement in telegraphy, and not as an invention of the telephone, and did lead them to suppose that it had no relation to the art of transmitting articulate speech by electricity, and did thus cause them not to make an inquiry as to the state of that art, or the patents or the printed publications concerning it; that accordingly no such inquiry was made by any of them, and that thereby the said Bell did mislead and deceive your orator, and did cause your orator to issue the said patent No. 174,465 in the form and according to the tenor aforesaid, and that but for the said delusive and ambiguous application the said patent would not have been granted or issued by your orator as aforesaid; wherefore your orator avers that the said patent No. 174,465, issued upon said delusive and ambiguous application, was and is void and of no effect.

"Your orator further avers and charges, upon information and belief, that at the time of filing the said application the said Bell was not the original and first inventor of all the improvements in telegraphy described and claimed in the said specification; that certain of the aforesaid so-called improvements had been previously known to and used by others, as is hereinafter more fully and at large set forth; that the said Bell, on the said 20th day of January, 1876, and at the time

of filing the said application, did not verily believe himself to be the original and first inventor of all the so-called improvements in telegraphy described and claimed in the said specification; and that on the said 20th day of January, 1876, and at the time of filing the said application, the said Bell did know and did believe that certain of the so-called improvements in telegraphy described and claimed in the specification aforesaid had been previously known to and used by others, as is hereinafter more fully set forth.

" And your orator avers and charges that the said untrue statements made by said Bell as aforesaid constituted deception and fraud upon your orator by the said Bell, and did deceive and defraud your orator, and did cause your orator to issue and deliver said patent No. 174,465 to said Bell upon your orator's faith that the said statements were true, and that but for the said false and fraudulent statements of the said Bell made by him as aforesaid the said patent would not have been issued or granted by your orator, so as to create any exclusive monopoly of the method or process described in the said fifth claim thereof."

It was then charged that Philipp Reis's device of " an apparatus for the transmission of speech by means of the galvanic current " (see 126 U. S. 33–74) was well known to Bell and the world before 1874, and that "many persons devised and were seeking to devise apparatus and means by which such method and process could be successfully operated, and made to transmit articulate speech;" and it was said that "not only did the said Philipp Reis make and operate an apparatus upon such alleged method or process, but divers other persons in this county did, prior to the alleged date of said Bell's invention, to wit, prior to the year 1875, well understanding the conditions under which alone speech and other composite sounds could be transmitted by electricity, experiment upon said problem, and devise, use and operate more or less perfect means therefor."

Then, after charging that the caveat of Elisha Gray, also set forth in *The Telephone Cases*, 126 U. S. 77–86, was filed in the Patent Office on the same day with Bell's application for his first patent, and prior thereto, the bill charged :

" That notwithstanding the requirements of the said statute to preserve said caveat in secrecy, the examining officer of the Patent Office communicated to the said Bell, very soon after the filing of the said caveat, the fact and date of the filing thereof, the name of the caveator, as well as the general nature of the claim contained therein, and some information as to the particular method employed; that the said Bell, by his attorneys, followed up this knowledge, unlawfully obtained, and induced some of the officers of the Patent Office to violate still further the requirement of secrecy concerning said caveat, by setting on foot an inquiry, for the benefit of the said Bell, as to the precise time of the day when the same was filed; and thereupon, without any proof, and contrary to law and the custom of the office, it was determined by the Patent Office authorities, contrary to the fact, that said caveat was filed after said application, although on the same day, and that the said caveator was not entitled to the notice which had already been given, or to any of the benefits of the said section, with respect to the application of the said Bell.

" That thereupon the examiner of the Patent Office who had the matter in special charge, without communicating to the said Gray the question that had been so raised as to the time of the filing of the respective papers, nor the determination thereof, or giving him any opportunity to establish by proof the actual time of filing his own, announced to him, by letter, dated February 25, 1876, that the said notice had been given under a misapprehension of the rights of the parties, and was withdrawn, and on the same day informed the said Bell, by letter, that the suspension of his application, had been withdrawn.

" That after the withdrawal and revocation of the suspension of the said application of Bell, the said Bell called upon the said examining officer at the room occupied by him in the Patent Office, and that the said examining officer did then, on or about the 26th or 27th day of February, 1876, exhibit to the said Bell the drawings of the said caveat of Gray, and did then and there fully describe to the said Bell the construction and mode of operation of the telephone illustrated in the said

drawing, and the method disclosed by the said Gray in said caveat of transmitting and receiving vocal sounds.

"That the said Bell did unlawfully obtain important information as to essential features of the invention of Gray as disclosed by his caveat, and did proceed without delay to make substantial amendments of his said specification and claims, which amendments were made on the 29th day of February, only four days after said withdrawal of notice was communicated to said Gray; that such amendments related to those parts of said Bell's alleged invention which he and his assigns have since claimed as the cardinal element or feature of his patent, to wit, the transmission of sounds by gradual or undulatory changes in the electrical current, as distinguished from alternate or pulsatory changes; that in the said notice of the 19th of February, 1876, the said examiner had distinctly advised the said Gray that the application of Bell seemed to conflict with his caveat in respect to the method of producing the undulations by varying the resistance of the circuit, and the method of transmitting vocal sounds telegraphically by causing these undulatory currents; that this same examiner, without the knowledge of the said Gray, communicated to Bell the fact that Gray's invention varied the resistance and produced undulations by means of a liquid transmitter; that upon and in consequence of this surreptitious information, and of the unlawful communications respecting the said caveat made to the said Bell, as herein above alleged, the said Bell made the said amendments, more clearly defining the distinction between pulsatory and undulatory currents, and substituting the word 'gradually' for 'alternately' wherever it occurred in one of his claims; and your orator charges that these amendments were substantial, as well in themselves as in their bearing upon the rights then secured by Gray under the statute, and were not verified by oath, and that the said patent was issued thereon, and during the pendency of said caveat, and with undue and unusual haste, and without proper consideration and in violation of the rights secured by said Gray, or of the rights and interests of the citizens of the United States with respect to the art of telephony now sought

to be monopolized by the defendant, the American Bell Telephone Company.

"That the examiner was of the opinion that the said application and caveat were in interference on principles employed on harmonic or multiple telegraphy, but not in the art of transmitting speech, and did not understand the application to lay claim to the art of transmitting speech; nor did the language of the specification, or the drawing attached thereto, give due, fair and intelligible notice that, notwithstanding the entitling of the invention as an improvement in the art of telegraphy, one portion thereof might be construed to have reference to telephony, which had been, since that art had been invented by Reis, the term adopted by lexicographers, and had come into general use as a recognized term of art, denoting a peculiar operation for transmitting speech by means of electricity.

"Your orator is informed and believes that the said Bell was not able to get the said devices shown in his patent, or any of them, to transmit and deliver articulate speech up to the time of issuing the said patent, on the 14th of February, 1876, and he did not intend to so operate them or any of them, nor was he aware that they or any of them would do so.

"Your orator further shows that on March 10, 1876, three days after the said patent issued to said Bell, he obtained for the first time articulate speech by an electric speaking telephone. This success was not obtained by any device or apparatus described in the said Bell's specification and patent, but on March 10, 1876, was obtained with the liquid transmitter, or water telephone, described in Gray's caveat, and a knowledge of which said Bell derived from the wrongful communication to him, as before shown, of the contents of the Gray caveat.

"These facts showing fraud, collusion and overreaching in the obtaining of the said Bell patent long remained artfully concealed from your orator, and have only recently been brought to your orator's knowledge and attention."

Then, after allegations which are not necessary to be set

forth at length, in order to understand the opinion of the court, including some allegations relating to the discoveries of Antonio Meucci, Thomas A. Edison, Asahel K. Eaton and to the Varley inventions, described in 126 U. S. 107–109; the bill charged respecting the Dolbear invention (see 126 U. S. 131–142) that "in addition to the above stated grounds for the invalidity of said patent No. 186,787, the said Bell procured his last-named patent by fraud upon one Amos E. Dolbear, professor of physics at Tufts College in Massachusetts, in the manner, and under the circumstances following, to wit:

"The said Dolbear did discover and invent the magneto-telephone, now used as a receiver by the American Bell Telephone Company, being the same as that embraced in the said patent issued to said Bell on said January 30, 1877, and made and exhibited a complete, perfect, articulate speaking telephone, on September 20, 1876, combining all the appliances now used in the modern magneto-telephone used by the defendant, the American Bell Telephone Company, professedly under the said last-named patent, and began to take steps to secure to himself, his heirs and assigns, a patent for the said invention from the government of the United States, and to that end communicated his invention to a friend, one Percival V. Richards, who was assisting him to procure a patent for his said invention.

"That said Richards, who was also a friend and associate of said A. G. Bell, while proceeding to secure a patent for said Dolbear for said invention, inadvisedly communicated the fact of said invention of the said Dolbear to the said Bell, and also communicated to him a description of said invention of Dolbear; whereupon and soon after he was informed by one Gardner G. Hubbard, who was a near connection of and associate with the said Bell, that said Bell had invented and secured a patent on said devices and inventions of said Dolbear over two years previously, which untrue statement was communicated, at the instance of said Bell, to said Dolbear, who believed the same, and thereafter ceased for a long time all further efforts to secure a patent for his said invention.

"That said Bell and Hubbard, as soon as they had gathered

and secured the details of said Dolbear's invention, proceeded forthwith to the city of Washington, and then and there applied for and secured said patent No. 186,787 for the invention of said Dolbear.

"Your orator further says that at the time said Bell made oath to his application for said invention he well knew that his oath was not true, and that not only he was not the inventor thereof, but that he had appropriated the invention of the said Dolbear.

"Your orator further says that said Amos E. Dolbear, soon after making said invention embraced in said patent No. 186,787, entered into a contract and bargain with the Gold and Stock Telegraph Company, a corporation existing under the laws of the State of New York, controlled by the Western Union Telegraph Company, to manufacture, use and sell his said invention, which said corporation had exclusive control of said invention, and made, used and sold said telephones of Dolbear for the space of nearly three years, when the said American Bell Telephone Company and the said Western Union Telegraph Company, in litigation then pending between them in what is known as the Dowd case, agreed to compromise their differences and appropriate to themselves the entire profits arising from telephony in the United States, and suppressed the fact as to the said invention of said Dolbear of said devices, and that said Bell had appropriated and patented the same.

"Your orator further says that said American Bell Telephone Company and said Western Union Telegraph Company, in order further to suppress the facts and deceive the public, caused a collusive interference case to be begun and prosecuted in the United States Patent Office between said Bell and said Dolbear, wherein said Dolbear was not represented except in name, and wherein his assigns, the said Western Union Telegraph Company, the American Bell Telephone Company and said Bell were the real parties and were all in one interest; which said interference case was prosecuted so as to suppress the fact that as against Bell said Dolbear was the inventor, the attorney for said Dolbear's assignee being in fact one of the

counsel for and in the pay of said American Bell Telephone Company; the testimony also being taken by apparently opposing counsel for opposing interests, but in fact for the same parties and for the same interests; and that accordingly, in the said case, it was decided that the defendant Bell was the discoverer and inventor of said device.

"And your orator charges that for the fraud aforesaid the said last-named patent, No. 186,787, is invalid, and ought to be cancelled and made void by the decree of this honorable court."

The bill further contained the following allegation:

"And your orator further says that prior to the grant of said letters patent No. 186,787, and prior to the 13th day of January, 1877, the day upon which the said Bell made oath to the application upon which the said patent was granted, and prior to the 15th day of January, 1877, the day on which the said application was filed in the Patent Office, the said Bell, as your orator is informed and believes, caused an application to be made for letters patent of Great Britain for the same invention as that described and claimed in the said letters patent No. 186,787; that letters patent of Great Britain, numbered 4765 and dated December 9, 1876, were issued to William Morgan Brown, patent agent, 'for the invention of improvements in electric telephony and telephonic apparatus, a communication from abroad by Alexander Graham Bell,' and that the invention described and claimed in said letters patent of Great Britain No. 4765 was the same as that described and claimed in said United States patent No. 186,787; yet the said Bell, as your orator is informed and believes, concealed from the Commissioner of Patents the facts above mentioned about the said letters patent of Great Britain, and in consequence of this suppression of the truth, a patent was wrongfully issued to him for a term of seventeen years instead of being so limited as to expire at the same time with the said letters patent of Great Britain."

To this bill the Bell Telephone Company filed a demurrer as follows:

"This defendant, the American Bell Telephone Company,

by protestation, not confessing all or any of the matters and things in the plaintiff's bill of complaint contained to be true in such manner and form as the same are therein set forth and alleged, doth demur to said bill, and for causes of demurrer shows that:

"I. (1) The said bill is multifarious, in that it joins allegations and prayers for relief, in respect of patent No. 174,465, dated March 7, 1876, and allegations and prayers for relief in respect of patent No. 186,787, dated January 30, 1877.

"(2) The bill does not point out and specify which of the persons, patents and publications referred to in its several schedules anticipate each of the inventions claimed in the said two patents respectively, nor in the several claims of each, it appearing by said schedule that some of the patents and publications therein referred to are subsequent in date to both the said patents granted to Bell.

"II. To so much of said bill as refers and relates to patent No. 174,465, dated March 7, 1876, this defendant demurs for the following causes of demurrer:

"(1) The plaintiff in and by its said bill does not show any power or authority, and no power or authority in law exists, in any person or party or any court, to bring said suit, nor to entertain the same, nor to give the relief therein prayed, nor any relief thereunder or touching the subject-matter thereof.

"(2) The plaintiff in and by said bill has not made or stated a case which calls upon or justifies this court in the exercise of its discretion to permit this bill to be entertained.

"(3) The plaintiff in and by its said bill has not made or stated a case which entitles it in a court of equity to the relief therein prayed for, or any relief whatever.

"(4) The plaintiff in and by its said bill has not made or stated a case which entitles it in a court of equity as against this defendant, the American Bell Telephone Company, to the relief therein prayed for, or any relief whatever.

"(5) The case stated in and by said bill is one which, as against this defendant, the assignee of said Bell patents, should have been prosecuted (if at all) with the utmost diligence, whereas, as against this defendant, it is a stale claim, contrary

to equity and good conscience, and one which, by reason of the gross laches and delay in prosecuting it, a court of equity ought not to entertain.

"III. To so much of said bill as refers and relates to patent No. 186,787, dated January 30, 1877, this defendant demurs for the following causes of demurrer:

"(1) The plaintiff in and by its said bill does not show any power or authority, and no power or authority in law exists, in any person or party, or any court, to bring said suit, nor to entertain the same, nor to give the relief therein prayed, nor any relief thereunder or touching the subject-matter thereof.

"(2) The plaintiff in and by said said bill has not made or stated a case which calls upon or justifies this court, in the exercise of its discretion, to permit this bill to be entertained.

"(3) The plaintiff in and by its said bill has not made or stated a case which entitles it in a court of equity to the relief therein prayed for, or any relief whatever.

"(4) The plaintiff, in and by its said bill, has not made or stated a case which entitles it in a court of equity, as against this defendant, the American Bell Telephone Company, to the relief therein prayed for, or any relief whatever.

"(5) The case stated in and by said bill is one which, as against this defendant, the assignee of said Bell patents, should have been prosecuted (if at all) with the utmost diligence, whereas, as against this defendant it is a stale claim, contrary to equity and good conscience, and one which by reason of the gross laches and delay in prosecuting it, a court of equity ought not to entertain.

"IV. This defendant demurs to the whole of said bill for each of the reasons set forth in Division III.

"V. (1) As to each and every charge in said bill set forth as the basis of an attack on the validity of said patents, or either of them, or any claim of either of them, this defendant demurs thereto separately for the reason that it does not show the said patent to be void, and also because the allegations therein contained, if true, would not entitle the plaintiff to the relief prayed for, nor to any relief in a court of equity.

"And it prays that this clause of demurrer may be taken

as a separate demurrer on each of said grounds to each such allegation as if repeated in a separate form to each.

"The allegations here referred to are the following: [setting forth the divisions in the bill demurred to.]

"VI. This defendant specially demurs to said bill for that it does not set forth any fraud in the procuring of said patents; and for that it does not specifically set forth what acts, if any, the complainant relies on as constituting fraud in procuring said patents; and for that it does not show when, how, from whom, or by what means the complainant first had knowledge or notice of each alleged fact, nor why, with due diligence, it would not have learned them earlier.

"VII. Wherefore, and for divers other good causes of demurrer appearing in said bill, the defendant doth demur to said bill, and to separate parts thereof where the demurrers are hereinbefore expressed to be to parts, and humbly demands the judgment of this court whether he shall be compelled to make any further or other answer to the said bill, or said separate parts where the demurrers are expressed to be to separate parts, and prays to be hence dismissed with his costs and charges in this behalf most wrongfully sustained."

The court below, after hearing argument, sustained the demurrers, and dismissed the bill. 32 Fed. Rep. 591.

*Mr. Solicitor General,* as *Acting Attorney General, Mr. Allen G. Thurman* and *Mr. Jeff. Chandler* for appellant. *Mr. Eppa Hunton, Mr. William C. Strawbridge* and *Mr. Charles S. Whitman* were on the briefs.

*Mr. James J. Storrow* for appellee.

The answers to this bill as a whole are, *first,* that equity will not interfere in such a case as this to displace ordinary litigation and to cancel a deed; and, *second,* that no power exists in the executive departments to bring, or in the Circuit Court to entertain, suits to cancel patents for invention, because (1) it invokes the exercise of a prerogative power which the judiciary act does not give, and (2) because the course of legislation

on the special subject of patents has not given the power, but has prohibited it.

*Pleading.* — The bill proceeds against two patents, and sets up against each of them various distinct and separable grounds of invalidity. Demurrers to the whole bill for want of power, and to the whole bill for want of equity, and also demurrers as to each patent and to each separate ground of attack, are authorized by the decisions of this court, and by the practice under the English *scire facias* to cancel patents. *Powder Co.* v. *Powder Works*, 98 U. S. 126; *Hindmarch on Patents*, pp. 401, 414, 721.

*The Question of Equity.* — The professed and sole purpose, object and effect of the bill is to draw into this suit to be here tried the questions of novelty of invention and sufficiency of the specification, which, both by statute and by the necessary rules of law, are triable in, and are every day tried in, infringement suits; to enjoin their trial in the statutory infringement suits now pending, and to impose upon those suits a decision on those questions to be here made; to sustain the patent if found valid, and cancel it or modify it if found bad or defective. It asks, therefore, for the exercise of the most startling powers of equity. *Atlantic Delaine Co.* v. *James*, 94 U. S. 207; *The Maxwell Land Grant Case*, 121 U. S. 325, 380; *Colorado Coal and Iron Co.* v. *United States*, 123 U. S. 307, 317.

Equity does not so interfere with the established, and especially with the statutory, course of litigation, without some strong exigency for such interference. It does not cancel a deed, nor restrain suits to enforce it, simply because it is void for reasons which would defeat it in those suits. It may interfere if the grounds of invalidity cannot be tried in those suits, or, *quia timet*, if the holder of the deed will not bring suits where the questions can be tried; or to bring peace to a title which has been so well determined in other litigation that equity will not allow it to be retried; but that is not the case here. The bill does not so aver. On the contrary, it shows, and this court knows judicially that this patent has been often tried, invariably sustained, and is now "established." That is fatal. *Miles* v. *Caldwell*, 2 Wall. 35, 39;

*Mt. Zion* v. *Gillman*, 9 Bissell, 479; *S. C.* 14 Fed. Rep. 123; *Bank* v. *Cooper*, 20 Wall. 171. Moreover, it is presumed on demurrer from the specific allegations of this bill, *United States* v. *Atherton*, 102 U. S. 372, 373, and this court knows judicially, that every attack on the patents here set up has long ago been passed upon in suits where the patent has been sustained. The bill does not deny this, nor does it suggest any reason for retrying them.

[To the rule of judicial notice, and to the point that on a demurrer the court considers those facts of which it takes judicial notice, the counsel cited: *Louisville & Nashville Railroad* v. *Palmes*, 109 U. S. 244; *King* v. *Gallun*, 109 U. S. 99, 101; *Brown* v. *Piper*, 91 U. S. 37; *Terhune* v. *Phillips*, 99 U. S. 592. As instances of *judicial notice* quoted in his brief: *Smith* v. *Ely*, 15 How. 137; *Gregg* v. *Tesson*, 1 Black, 150; *Pensacola Tel. Co.* v. *Western Union Tel. Co.*, 96 U. S. 1; *United States* v. *Union Pacific Railroad*, 98 U. S. 569; *Sinking Fund Cases*, 99 U. S. 700; *Wade* v. *Walnut*, 105 U. S. 1; *Gilson* v. *Dayton*, 123 U. S. 59; *New Hampshire* v. *Louisiana*, 108 U. S. 76.]

Bills will also lie to prevent multiplicity of suits; but only to secure that end; and, therefore, only where one trial will determine the question forever, and prevent retrials in the suits sought to be avoided. This bill does not state such a case. As matter of law, every infringer can retry all the defences here presented, though this court should find them all to be without merit.

These propositions are established by the following authorities: *Miles* v. *Caldwell*, 2 Wall. 35, 39; *Stark* v. *Starrs*, 6 Wall. 402; *United States* v. *Wilson*, 118 U. S. 86; *Insurance Co.* v. *Bailey*, 13 Wall. 616; *Grand Chute* v. *Winegar*, 15 Wall. 373; *Hendrickson* v. *Hinckley*, 17 How. 443, 445; *Hapgood* v. *Hewitt*, 119 U. S. 226; *Wickliffe* v. *Owings*, 17 How. 47, 50; *Holland* v. *Challen*, 110 U. S. 15, 19; *Frost* v. *Spitley*, 121 U. S. 552; *Orton* v. *Smith*, 18 How. 263; *Craig* v. *Leitensdorfer*, 123 U. S. 189; *Lessee of Parrish* v. *Ferris*, 2 Black, 606; *Vetterlein* v. *Barnes*, 124 U. S. 169, 172; *Kerrison* v. *Stewart*, 93 U. S. 155, 159.

These considerations are controlling for another reason. If there is no exigency which would require equity to exercise the power, the case is not within the region where its creation by equity without pretence of statutory authority can even be discussed.

The charge of the fraudulent substitution of a new specification made in 126 U. S. 242, 244, 471, 568, is not made here, but is refuted; for the bill states that the original specification was sworn to January 20, 1876, filed February 14, 1876, and is now on file; it annexes a copy of the existing file which is like the correct copy in *The Telephone Cases*, 126 U. S. 4. The charges of corruption in the Patent Office, which led the Secretary of the Interior to advise a bill on the ground that they could not be satisfactorily investigated in an infringement suit, are not in this bill. The bill filed by leave of the Solicitor General at Memphis in September, 1885, contained abundant and specific charges of fraud about the principal patent, but they are struck out of this bill, though its origin is shown by the fact that some of the allusions to them and prayers based on them are copied *verbatim*. It makes profuse use of the words "fraudulent," etc., but such general phrases, even if in the form of allegations, will not rouse a court of equity. It does not allege acts which constitute fraud or justify interference. *Ambler* v. *Choteau*, 107 U. S. 586; *Colorado Coal Co.* v. *United States*, 123 U. S. 307, 317; *United States* v. *Atherton*, 102 U. S. 372.

The case, however, cannot turn upon the mere presence of moral fraud. Equity interferes to displace ordinary litigation on the ground of fraud only when the facts which constitute the fraud do not afford a defence in that litigation. It does not set aside a deed because of mistake or of dishonest practices unless it appears that the error or fraud touched the *right* of the grantee, and not merely the mode in which the deed was obtained, and that the grantee was not justly entitled on the merits to the thing granted. Kerr on Fraud and Mistake, 479; *Rooke* v. *Lord Kensington*, 2 K. & J. 753, 763; *Fowler* v. *Fowler*, 4 De G. & J. 250, 273; *Sells* v. *Sells*, 1 Drew. & Sm. 42; *Southern Development Co.* v. *Silva*, 125 U. S. 247, 250

259; *Grymes* v. *Sanders,* 93 U. S. 55; *Quimby* v. *Conlan,* 104 U. S. 420; *United States* v. *Minor,* 114 U. S. 233, 239; *Ming* v. *Woolfolk,* 116 U. S. 599, 602; *Slaughter's Administrators* v. *Gerson,* 13 Wall. 379, 383; *Attwood* v. *Small,* 6 Cl. & Fin. 232.

In the face of the recitals in the patent, or even without them, the grantor cannot set up defects of procedure or any flaw in the deed to avoid the grant. *Grant* v. *Raymond,* 6 Pet. 218, 244; *Kansas City etc. Railroad* v. *Attorney General,* 118 U. S. 682; *Polk's Lessee* v. *Wendall,* 9 Cranch, 87, 99; *United States* v. *Arredondo,* 6 Pet. 691, 714, 729; *Coloma* v. *Eaves,* 92 U. S. 484.

It results, therefore, that equity will not notice attacks except such as go to the inherent right of the patentee, *i.e.,* want of novelty and radical insufficiency of the specification, or other matter, if there be any, which shows that, he was not "justly entitled to his patent under the law." Rev. Stat. § 4893. A bill to cancel therefore is not and cannot be for the purpose of trying any defences except those which would defeat it in an infringement suit.

*Scope of the Bill and Nature and Consequence of the Power invoked.* — The bill, in its jurisdictional clauses, Division I., defines the power invoked as a power in "the executive department" to bring before the courts for investigation and determination any patent for an invention which the Attorney General alleges has been issued to one who is not the first inventor, or for an invention which is not both new and useful; and this whether the unlawful issue be the result of "accident, inadvertence, mistake *or* fraud." That is, it exists whenever the patent is alleged to be affected with vices which would defeat it in an infringement suit, no matter what led to the error in the grant. The specific allegations of this bill are such that it cannot be sustained unless the power be as broad as this.

The bill avers that it is "within the power, and in a proper case within the duty," of the executive department to do this. Undoubtedly if the power exists it must be exercised whenever its exercise will affect private interests. *Butterworth* v. *Hoe,*

112 U. S. 50, 57. A suit must be brought, therefore, whenever there is substantial ground to question the validity of a patent, and most patent litigation must thus be transferred to the Attorney General's office, with the public treasury against the patentee, and no costs allowed him when he prevails. That Congress has not organized that office so that this work can be done, shows that Congress did not intend that it should be done.

The bill avers the power to be a power to bring the patent " to a judicial investigation and determination, to the end that in case such patent be found valid, it may be sustained by proper judicial judgment," or " be cancelled in whole or in part ; " and " that the whole patent be treated as a contract to be annulled, reformed or modified as in law and equity and good conscience it ought to be ; " and that the bill is brought " in performance of this duty " and "as a means of causing justice to be done to " the patent owner, "as well as to all others, citizens of the United States, in whose interests and for the restoration and protection of whose rights this suit is instituted."

The prayers are for cancellation or modification of the patent, and for a perpetual injunction against all infringement suits, many of which it alleges are now pending.

When either party to a contract brings it before a court for cancellation or modification, the court grants the prayers of the plaintiff, or sustains the contract or modifies it in favor of the *defendant*, according to the right, because it lays hold of the whole subject matter only to do, once for all, complete justice between both sides. *Lessee of Parrish* v. *Ferris*, 2 Black, 606; *Piersoll* v. *Elliott*, 6 Pet. 95; *Carnochan* v. *Christie*, 11 Wheat. 446; *Bradford* v. *Union Bank*, 13 How. 57. It does this even when the United States is plaintiff. *The Siren*, 7 Wall. 152; *The Davis*, 10 Wall. 15; *United States* v. *Union Pacific Railroad*, 98 U. S. 569, 607. This bill appeals in terms to this well-known power; and the suggestion that its exercise here will once for all " determine " the validity of the patent, and " do " justice between the patentee and all other citizens on whose " interests " this bill is in terms based,

and whom the Attorney General claims to represent as *parens patriæ*, is what makes it appear plausible.

Yet it is certain that this power cannot be applied to this subject matter. The patent cannot be modified except by reissue or disclaimer in the Patent Office. *Kittle* v. *Merriam*, 2 Curtis, 475. It cannot be " sustained " so as to bind the very persons on whose " interests" the suit is professedly and in fact based, nor even the defendants in the existing infringement suits sought to be enjoined; for the statute gives to each infringer the absolute right to try the validity of the patent. Now, equity always refuses to displace ordinary litigation in order to try questions triable therein unless it has before it, so as to be bound by its decree, all those interests which, if not so bound, could retry those questions. *Orton* v. *Smith*, 18 How. 263; *Kerrison* v. *Stewart*, 93 U. S. 155, 159; *Craig* v. *Leitensdorfer*, 123 U. S. 189; *Vetterlein* v. *Barnes*, 124 U. S. 169, 172; *Weale* v. *West Middlesex Water Works*, 1 Jac. & Walk. 358, 369; *Adair* v. *New River Co.*, 11 Ves. 429; *Smith* v. *Swormstedt*, 16 How. 288, 303. Equity therefore will not allow this bill to try questions open in infringement suits, — and none others can support it.

Moreover, the exercise of the equity power invoked is prevented by the legislation of Congress on this specific subject matter; which means that it is inconsistent with and therefore forbidden by the act of Congress.

The Attorney General, therefore, is driven to and does assert *an inherent and absolute power*, inherited from the English monarch, to compel the court to try this case because he brings it.

*The Question of Power.* — Power adequate for this case. must be found both in the Attorney General and the Circuit Court; for a party competent to ask is as essential as a court able to grant. *Osborn* v. *Bank of the United States*, 9 Wheat. 738, 819.

A patent for an invention is not a conveyance of existing property which will again become property in the grantor if the patent be cancelled. It is a command by the sovereign to its subjects to refrain from that which, but for that command,

they might do; its cancellation is a recall of that command. Its effect depends upon the obedience the subjects render; and when they are protected in disobeying it, it is the same as if it no longer existed. The recall, like the grant, is *the exercise of a purely governing power* which belongs to the United States as sovereign; it is not based upon the plaintiff's right of property, as a grant of land or a bill to cancel such a grant is.

Who can exercise this power?

Power is conferred upon "the government," *i.e.*, "the United States," by the Constitution alone. Legislation does not create its powers; it is the means by which the United States exercises them. "Respecting the power of government no doubt is entertained. . . . When the sovereign authority shall choose to bring it into operation, the judicial department must give effect to its will. · But until that will shall be expressed, no power of condemnation can exist in the court." *Brown* v. *United States*, 8 Cranch, 110, 123. When, under our frame of government, any court, officer, or person wishes to do any act in the exercise of an admitted sovereign power, which the Constitution has not in explicit and definite terms conferred on it or him, the question is not whether "power" exists, but whether statutory law has expressed the intent of the sovereign that the power shall be exercised, and has delegated him to exercise it. *The Floyd Acceptances*, 7 Wall. 666, 676. If Congress had put into the patent act, which creates and defines our rights, a provision for such a proceeding, the courts might entertain it. But it has not. It has, moreover, once enacted it, then repealed it, and expressly refused to reinstate it. The effort now is to maintain the suit as if such a provision were in the act.

It is the moral duty of a sovereign to provide some means by which to inquire, and to relieve the subjects from the stress of the command of a patent, if it ought not to have been issued. Under the old English law, no subject could dispute it; and there arose, of necessity, a proceeding by which the sovereign, as *parens patriæ*, that is, in the interests of the subjects, could formally recall it. When, in the time of Elizabeth, the senti-

ment of the individual strength and initiative of each citizen developed in English civilization, the subject insisted, first in the courts, *The Case of Monopolies, Darcy* v. *Allein*, 11 Rep. 84 (1602), and as that was without practical effect, established through parliament by the *Statute of Monopolies*, 21 Jac. I. c. 3 (1623), that each subject might protect himself in disobedience by setting up in an infringement suit that the patent ought not to have been granted. This latter mode of meeting the difficulty has been found so much more efficient, and so much more consonant to the spirit of modern civilization, that, in England, where both modes were lawful up to the English statute of 1883, the direct proceeding has been employed only twenty times, the first being in 1785 and the last in 1855. In this country, since 1836, 350,000 patents have been granted, about 3000 have been tried, and only one direct suit to cancel has been maintained. It is clear, therefore, that the question of the existence of this particular proceeding is the question of a choice among modes, all conducive to the same end, and not a question between some remedy and none; and that experience shows that the use of the remedy is not necessary for the practical success of a patent system.

The defence remedy, without cancellation, is very adequate. The glory of our American system is the protection it affords through the courts against laws there is no authority to enact. Yet all that the court does is to declare in a private suit, by a decree which technically binds only the parties to it, that the law is unauthorized. The statute is not cancelled. It cannot even declare this until a suit to enforce the law is brought; and the defence is intrusted to private hands. The same kind of remedy cannot be deemed inadequate for the patent system, all parts of which are based for their operation and motive power on personal interests. The great work of making inventions, perfecting the machines and pushing them into public use rests solely on private enterprise and initiative. The lesser work of litigation may well be trusted to the same forces. There is no instance in which the patent system calls upon executive action, or even permits executive control. *Butterworth* v. *Hoe*, 112 U. S. 50. It would be contrary to its

whole spirit to introduce it here. Moreover, the nature of a patent right is such that it cannot be an important factor in the community until it has been so well tried that the courts will sustain it by injunctions.

This is not a bill to prevent the vexatious use of a patent which has been found bad. It is a suit to try whether it is good or bad, or rather to retry it after it has been held good against these same attacks, in suits which the bill does not impugn; so that this particular case presents no exigency.

The maintenance of this suit must depend on the will of Congress alone. For, *first*, all the power about patents that exists in the federal government is based on the grant made by the Constitution to Congress, "to whom the grant of a power means the grant of a branch of sovereignty." *Hamilton* v. *Dillin*, 21 Wall. 73, 93. *Second*, it is school-boy learning that the Circuit Court has only such powers as Congress has conferred, and that these are much less than the Constitution authorized. *Third*, the Constitution gave to Congress the power "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers" [those specially granted to Congress] "and all the powers vested by this Constitution in the government of the United States, or in any department or officer thereof."

Each of these powers authorizes Congress to put into the patent system any features, and give to the courts with relation to it any specific powers which are "conducive" to its general purpose; and among all those which in their nature are conducive, to select those which it prefers. *United States* v. *Fisher*, 2 Cranch, 358, 396. Indeed the essence of legislative power is the power to choose and make the law what it will; while the executive and the judiciary "can pursue only the law as it is written." *Brown* v. *United States*, 8 Cranch, 110, 129, approved in *Conrad* v. *Waples*, 96 U. S. 279, 284. The choice of Congress, if it can be ascertained, is therefore conclusive.

The framers of our Constitution and our early patent acts found a patent system already existing in England. The in-

fringements of Watt's and Arkwright's patents, and a *scire facias* to repeal Arkwright's second patent, tried in 1785, drew their attention particularly to the subject of litigation. The English system rested purely on the prerogative of the king and on a practice which grew up in the offices of the Attorney General and of the great seal where he exercised that prerogative. Until the recent act of 1883, the applicant for a patent obtained a *fiat* signed by the Attorney General in person, directing that the patent be engrossed and sent to one of the offices of the great seal, called the petty bag. There the Lord Keeper of the great seal, the Lord Chancellor, by a warrant under his sign manual, ordered the great seal to be affixed. For a recall, a summons in the form of a *scire facias*, setting forth the grounds of invalidity alleged, was laid before the Attorney General, who indorsed on it a *fiat* upon which the petty bag issued the process directing the patentee to bring back his patent into the petty bag, and there show cause why it should not be there cancelled. Thereupon he showed cause, in the form of demurrers, pleas or answers, and issues of fact or law were made up.

The petty bag was sometimes spoken of as the common-law side of the chancery, which meant that it was the place where the Lord Keeper exercised powers which the common law or constitution of England attached to the possession of the great seal; but it was not a judicial office. It therefore sent a copy of the record to the king's personal court, the King's Bench (never to the Common Pleas), asking, in the form of the old writ of right, that the judges and jury would inquire into the matter and advise the king. The result of a trial of the issues was certified back to the petty bag, the form of the return, stating that judgment could neither be given nor executed in the King's Bench. Then, after a summons, an order reciting deliberation by the king in person in his chancery was made, cancelling the patent. Under this proceeding, patents could be cancelled for fraud in procurement, and also for mere invalidity or for mere technical defects unmixed with fraud. The authorities and the forms are given in *Hindmarch on Patents*, 1846; and, less fully, in *Chitty on the Prerogatives*

of the Crown, 1820; *Foster on Scire Facias*, 1851; *Blackstone*, book iii. c. 17.

Thus both the grant and the recall were purely prerogative acts done by the king *quasi* in person, as monarch. *No judicial authority ever cancelled a patent for an invention in England.*

As this power concerned only the interests of the subjects, and as the king exercised it only as *parens patriæ*, he was bound *de jure* to allow the use of it to any subject interested. 4 Coke, Institute, 87; *King v. Butler*, 3 Levinz, 220; *Queen v. Aires*, 10 Mod. 258, 354; *The Magdalen College Case*, 11 Rep. 66, 74 b; *Legat's Case*, 10 Rep. 113 b; *Blackstone*, book iii. c. 17, § 3, p. 330; though this was a moral and not a legal obligation. The invariable practice was to intrust the prosecution of the *scire facias* entirely to a private prosecutor, who was required to give a bond, usually in £1000, and sometimes in £2000, to pay to the patentee, if the prosecution failed, full costs and expenses taxed as between solicitor and client. It was thus in effect a remedy public in form, but placed in private hands.

It was first used against patents for inventions in 1785, and last in 1855, after which it fell into entire disuse. Johnson's Patentee's Manual, ed. 1879. In the interval it was only used twenty times, and chiefly to assail patents on purely technical grounds such as a court of equity would not listen to. A *scire facias* against Neilson's hot-blast patent, brought while the validity of the patent was before the House of Lords in an infringement suit, was stayed by Lord Lyndhurst as vexatious. Webster Pat. Cas. 665. After the cancellation of Daniell's patent, the statute 5 and 6 Will. IV. c. 83 (1835), provided that if a patent should ever be assailed on such a ground again, the pri y council might validate it. Arkwright's second patent was cancelled in 1785 for technical defects in the specification.

The English *scire facias* cases against patents for inventions are: *The King v. Arkwright*, Webster Pat. Cas. 64 (1785); *The King v. Else*, Webster Pat. Cas. 76; S. C. 1 Brodix Am. and Eng. Pat. Cas. 40 (1785); *Rex v. Cutler*, 1 Starkie, 354;

*S. C.* 1 Carpmael Pat. Cas. 351; *S. C.* 1 Brodix, 225 (1816); *Rex* v. *Metcalf,* 1 Brodix, 297; *S. C.* 1 Carpmael Pat. Cas. 392; *S. C.* 2 Stark. 249 (1817); *The King* v. *Wheeler,* 2 B. & Ald. 345; *S. C.* 1 Carpmael Pat. Cas. 394 (1819); *The King* v. *Fussell,* 1 Brodix, 388; *S. C.* 1 Carpmael Pat. Cas. 449; *Rex* v. *Hadden,* 1 Brodix, 386 (1826); *The King* v. *Daniell,* 1 Carpmael Pat. Cas. 453; *S. C.* 1 Brodix, 392 (1827); *The Queen* v. *Neilson,* Webster Pat. Cas. 665 (1842); *The Queen* v. *Newall,* Webster Pat. Cas. 671, n.; *The Queen* v. *Nickels,* 3 Brodix, 390; *The Queen* v. *Walton,* 3 Brodix, 436; *S. C.* 1 Webster Pat. Cas. 626, n. (1842); *Smith* v. *Upton,* 6 Scott, N. R. 804; *Muntz* v. *Foster,* 1 Dowling & Lowndes, 942 (1843); *Bynner* v. *The Queen,* 9 Q. B. 523 (1846); *Regina* v. *Cutler,* 3 Carr. & K. 215 (1847); *The Queen* v. *Prosser,* 11 Beavan, 306 (1848); *Regina* v. *Mill,* 10 C. B. 379 (1850); *The Queen* v. *Betts,* 15 Q. B. 540 (1850); *The Queen* v. *Hancock,* 5 De G. M. & G. 331 (1855).

Dealing with the subject in the light this system afforded, our Constitution gave no power to the executive, but gave all to Congress; and the power it gave to Congress was the power to create by legislation a system according to its own judgment. Such a statutory system would contain those features Congress thought fit to place there; and what Congress did not put there, no other authority could add. For otherwise the system would not express the will and choice of Congress. The essence of our patent system is that what is not authorized by the act is *ultra vires.* *Mahn* v. *Harwood,* 112 U. S. 354, 358. For, unlike England, here " it is founded exclusively on statutory provisions." *Shaw* v. *Cooper,* 7 Pet. 292, 318; *James* v. *Campbell,* 104 U. S. 356. What is not in those provisions, by express words or necessary implication, is not in the system.

*How the Will of Congress is to be ascertained.* — The power of Congress on this subject is plenary, paramount and exclusive, and has been exercised by elaborate legislation, frequently revised. The established rule in such cases is that what the legislature wishes, it writes into the statute. Its legislation is not read as a grant of power additional to what might exist

in the absence of legislation, but as a definition or a delimit-·
ing act. What is granted, is allowed, what is not granted, is
forbidden; and a power given by a statute, afterwards re-
pealed, is expressly prohibited. *Ex parte McCardle*, 7 Wall.
506, and cases cited.

Congress created the first system by the act of 1790, elabo-
rated in its details by the act of 1793. That system remained
until it was replaced by the radically different plan of 1836,
which, varied in its details by sundry revising acts, is in
substance the system of to-day.

The acts of 1790, 1793, contemplated that sometimes a
patent would be granted which ought not to be. It met that
evil by the fundamental remedy of allowing every person to
protect himself by showing that fact. But should patents
thus judicially ascertained to be bad be allowed to stand, in
the belief that no serious evil would come from the mere
existence of a condemned patent, or should they be cancelled;
and should aggressive proceeding be allowed against patents
which the owner would not expose to trial in infringement
suits? That is, should cancellation remedies be added to the
defence remedy, and if so, to what extent and in what mode?
The legislation recognized the existence of all these exigencies,
and made precise provision for each, to such extent as it
thought wise.

If the defendant in the infringement suit proved both inva-
lidity and also an actual fraudulent intent, each found by the
jury, the court was to cancel the patent; but if only absolute
invalidity without actual fraud in the procurement were
proved, the patent was not to be cancelled. Act 1793, § 6. By
§ 10 the sovereign remedy to cancel a *scire facias* might be
allowed to a private prosecutor, provided he showed fraud as
well as invalidity, and provided he applied within three years
from the date of the patent; but the discretion to allow the
process, which in England was in the Attorney General, was
by our act vested in the District Court, to be exercised only
after hearing both parties on a rule to show cause. *Ex parte
Wood*, 9 Wheat. 603, 606; *Grant v. Raymond*, 6 Pet. 218,
244. In *Wood's Case*, replying to the argument *ab inconveni-*

*enti*, from the narrowness of the statute, this court remarked, "If such a repeal be not had, the public have a perfect security; they may violate the patent with impunity, and if sued" may plead invalidity.

Thus Congress covered all the cases and the features of the English system, making the cancellation remedy, however, narrower in each case, and intrusting the allowance of it to the District Court instead of to the Attorney General. That excludes all implication of any other use of it. Moreover, the whole statute about the aggressive proceeding would be nullified if, when a private promoter had been refused by the District Court, either in the exercise of its discretion or because the case was excluded by the statute, the Attorney General had, as in England, an inherent power to grant it in every case. All the power of cancellation which could be exercised, therefore, was such as that legislation expressly gave. In 1836, Congress repealed even this provision, and limited the power to cancel to the case where two patents had been granted to two persons for the same invention. This has continued to be the condition of the statutes. Acts 1836, § 16; 1870, § 58; Rev. Stat. § 4918. The Commissioners of Patents by their reports, Congress by its committees and its votes, and the courts where the question has arisen, have declared that there could be no other cancellation under existing legislation.

*Powers by Implication.* — What is implied by a statute is as much a part of it as if called by name. *Ex Parte Yarbrough*, 110 U. S. 651. But the rule of implication is a rule for ascertaining the particular intent of the grantor touching the precise matter in question. The right may be *implied*, but cannot be *supplied*. The court may "effectuate the intention of the parties to the extent to which they may have imperfectly expressed themselves;" but it cannot add such provisions "as the court may deem fitting for completing the intention of the parties, but which they either purposely or unintentionally have omitted. It would be inadmissible to deduce an implication of a promise, not from the contract itself, but from the extraneous fact that such a promise ought to have been exacted." *Maryland v. Railroad Co.*, 22 Wall.

105. However clear the court may be as to what abstract justice requires, it "would transgress the limits of judicial power by an attempt to supply by construction the supposed omission of the legislature." *Evans* v. *Jordan*, 9 Cranch, 199, 203; *Rees* v. *Watertown*, 19 Wall. 107, 122; *United States* v. *Union Pacific Railroad*, 91 U. S. 72, 85. If a right be created which will be purely illusory unless some remedy be provided, and the statute specifies none, the courts presume that the legislature intended that the well-known processes which are adequate to the case should be used. But no such implication arises because the remedies given are not as complete as the court thinks wise, or because, though they maintain the right or the system of efficiency as a whole, a case occasionally arises which they do not meet.

That equity, however, cannot, on this subject matter, exercise its usual powers, and that the circumstances of this case do not call for the interference asked, is fatal to any request to find the power by implication or to exercise it.

As to the public land, the executive department has authority to use the ordinary remedies based on a property interest in the United States, and that authority arises from such a necessary implication from positive legislation. From the earliest time it has been held that Congress, by requiring the various departments to transact business which involved the care and the custody of property, impliedly authorized them to make such contracts as were usually employed in such business, and without which it could not be practically carried on, and to bring such suits as the ordinary course of that business might need; for that is incident to the principal power. *Dugan* v. *United States*, 3 Wheat. 172; *The Floyd Acceptances*, 7 Wall. 666, 675. Congress has ratified that rule, by continuing to require the performance of that work, and giving no other means. The same rule applies to the case of the public lands, because the course of legislation has given to the executive departments, not simply the power to grant patents, but "the general care of those lands." *United States* v. *Schurz*, 102 U. S. 378, 396. That necessarily gave to the department authority to bring all those suits based on the rights

of the United States as property owner which were needed to prevent the timber or the title to the lands themselves from being stolen, or to retake them if they had been. All the suits to cancel patents for lands have been maintained solely on this property basis, and this court has decided that they cannot be maintained on any other.

In *The Floyd Acceptances*, 7 Wall. 666, 680, the court said of these implied powers in the departments, "The authority to issue bills of exchange not being one expressly given by statute, can only arise as an incident to the exercise of some other power." If Congress had given to the executive the general care of patents for inventions, the power to bring suits respecting them might possibly have passed as an incident; but it has given no power whatever to the executive on that subject. On the contrary, in the very strong case of *Butterworth* v. *Hoe*, 112 U. S. 50, this court decided that the patent system was purely a congressional system, absolutely free from executive control, and that no power existed in the executive branch respecting it unless expressly and in terms given. Moreover, in the case of the public lands a patent granted in due form is absolutely binding, and will sustain ejectment against the United States; a bill to cancel is absolutely necessary, because if it will not lie, there is no relief of any kind. But that necessity does not arise in the case of patents for inventions, since every one is licensed to disobey them if he can show that they ought not to have been granted.

*The Judiciary Act does not authorize the Circuit Court to entertain this Suit.* — There is no statute which can confer this power unless it be the judiciary act. The Lord Chancellor had two distinct classes of powers: his powers as an equity judge, and the powers which, though he exercised them through judicial forms, were based upon the *parens patriæ* or prerogative power of the king whom he represents. The King's Bench, and the exchequer, also, had the latter class to some extent. It has been settled for two generations that the broadest general grant of law and equity powers, such as is contained in the judiciary act, confers only the strictly judicial powers, and does not confer any of the prerogative or gov-

erning powers. The courts cannot exercise them unless they are given in terms. This was decided under various state statutes, and under the judiciary act of 1789. The controlling words of that act — "*suits of a civil nature at common law or in equity*" — were, after those decisions, repeated in the acts of 1875 and 1887. Whenever an appeal is made to the courts, even by the Attorney General, to exercise these powers, "the constantly recurring answer is," that though the legislature might have called these powers into operation, "it has not done so." *United States* v. *Union Pacific Railroad, supra.* The following cases expressed this rule, and turned directly upon it. *Attorney General* v. *Utica Insurance Co.*, 2 Johns. Ch. 371 ; *People* v. *Ingersoll, Tweed and Garvey*, 58 N. Y. 1 ; *Wheeler* v. *Smith,* 9 How. 55 ; *Fontain* v. *Ravenel*, 17 How. 369 ; *Russell* v. *Allen*, 107 U. S. 163, 170 ; *Pennsylvania* v. *Wheeling Bridge*, 13 How. 518 ; *Wisconsin* v. *Pelican Ins. Co.*, 127 U. S. 265 ; *United States* v. *Union Pacific Railroad,* 98 U. S. 569.

It has already been pointed out that this proceeding is based on *the governing* power of the United States, and not on its right as the owner of property. The distinction between these two classes of rights and the importance of it have often been declared. *Vernon's Case*, 1 Vernon, 277, 370.; *Cotton* v. *United States*, 11 How. 229 ; *United States* v. *Hughes*, 11 How. 552, 568 ; *United States* v. *Union Pacific Railroad*, 98 U. S. 569 ; *Packet Co.* v. *Keokuk*, 95 U. S. 80, 85 ; *Huse* v. *Glover*, 119 U. S. 543, 550 ; *Pennsylvania* v. *Wheeling Bridge*, 13 How. 518, 560 ; *United States* v. *State Bank*, 96 U. S. 30, 36.

This court has applied this rule to the cancellation of land patents. In England the king could protect the crown lands either by suits based on property rights, "like any private gentleman," *Vernon's Case*, 1 Vernon, 277, 370 ; or by prerogative remedies, such as *scire facias*, information, etc. Chitty on the Prerogatives of the Crown, 332 ; *Lord Proprietor* v. *Jennings*, 1 Harris & McHenry, 92. In *Cotton* v. *United States*, 11 How. 229, this court decided that the United States might employ the property remedy with regard to its lands. In *United States* v. *Hughes*, 11 How. 552, 568, after argument

on a demurrer which turned on this precise point, it decided that, the Attorney General could not employ the sovereign suit (an information) to cancel a patent for land, but could only use the ordinary bill in equity based on a property interest, like a private person. Every bill to cancel a land patent has relied on that decision, and has been carefully and specifically based on a property interest in the United States, or in a grantee whose interests it was under a binding obligation to protect. The rule of these cases which absolutely covers the case at bar is stated in *Russell* v. *Allen*, 107 U. S. 163, 170. " The question was whether the authority of a court of chancery, under such circumstances, belonged to its ordinary jurisdiction over trusts, or to *its prerogative power under the sign manual of the crown, which last has never been introduced into this country.*"

There are many instances where powers habitually exercised by the king, or the prerogative courts in England, have been denied to the courts or the executive here, on the ground that statutory authority is required. The *cy-pres* power : *Wheeler* v. *Smith,* 9 How. 55, 78 ; *Fontain* v. *Ravenel,* 17 How. 369 ; *Russell* v. *Allen,* 107 U. S. 163, 170. The boundary cases were denied by the Chief Justice on the ground that they called for the exercise of governing powers; they were sustained by the majority, because they found a special authority to exercise them ; *e.g., Rhode Island* v. *Massachusetts,* 12 Pet. 657, 721, 752; 4 How. 637. Certiorari : *Ex parte Vallandigham,* 1 Wall. 243, 249. Mandamus : *Rees* v. *Watertown,* 19 Wall. 107 ; *Heine* v. *Levee Commissioners,* 19 Wall. 655 ; *Thompson* v. *Allen County,* 115 U. S. 550. Appellate powers of the Supreme Court : *Ex parte Gordon,* 1 Black, 503 ; *Ex parte Vallandigham,* 1 Wall. 243, 249 ; *Ex parte McCardle,* 7 Wall. 506. Confiscation and condemnation of enemy's property on land : *Brown* v. *United States,* 8 Cranch, 110. Power to waive the sovereign exemption from suit : *United States* v. *McLemore,* 4 How. 286; *The Davis,* 10 Wall. 15 ; *Case* v. *Terrell,* 11 Wall. 199; *Carr* v. *United States,* 98 U. S. 433; *United States* v. *Lee,* 106 U. S. 196, 205. Nuisance : *Pennsylvania* v. *Wheeling Bridge,* 13 How. 518, 564 ; *Wil-*

*lamette Bridge Co.* v. *Hatch*, 125 U. S. 1, 15. Libel on the President and Congress: *United States* v. *Hudson*, 7 Cranch, 32. Priority over other creditors: *United States* v. *Fisher*, 2 Cranch, 358; *United States* v. *Bryan*, 9 Cranch, 374; *United States* v. *Howland*, 4 Wheat. 108. Power of one House of Congress to punish for contempt: *Kilbourn* v. *Thompson*, 103 U. S. 168.

*Mr. Edward N. Dickerson* for appellee.

The question is not whether there is power in the "government," but whether there is power in the Attorney General to bring, and in the Circuit Court to entertain, this suit; not whether "the United States" possesses the power, but whether the United States, by its only mouth-piece on the subject of patents, its Congress, has shown its wish to exercise it. The Attorney General asserts that the executive has the absolute power to bring this suit, and also to compel the court to entertain it. Upon the correctness of that assertion this case must stand or fall.

There was and is an English system, based on the prerogative of the king, not as an executive, but as *king*. There is an American system, created by statute. The Attorney General proposes a third system. It is not based on a royal power, as in England, for our executive is not a monarch. It is not based on statutes, like the American system, for no statute even suggests it. It is based on what I will call the "*executive prerogative*," found in neither of those two systems. Its essential features, as the Attorney General would have them, are also foreign to both. For this bill could not be maintained under either.

The Constitution abolished the prerogative basis and made patents for inventions to be based on a delegated authority — delegated by "the people" to Congress, and exercised by Congress, by authorizing various persons and tribunals to do the precise work it intrusts to them. Congress, by statute, authorized the use of a cancellation process like the *scire facias*, but under strict limitations, and intrusted the allowance of it to

court and not to the Attorney General, who had the sole power to allow it in England. This permitted no other use of it. In fact, a use here of the power of the English Attorney General would completely nullify that statute.

If any prerogative existed in the Attorney General by inheritance, it must have come to him as it existed in England. Yet, on the one hand, the statute did not permit that power here. The Attorney General, on the other hand, has to dissect out of it an integral part, in order not to defeat this proceeding, which could not have been brought and prosecuted as it has been, if the English practice had been followed. For in England the public treasury is not allowed to be used against a patentee; the private promoter is also obliged to indemnify the patentee, not only in taxed costs, but for his full expenses if the prosecution fails; and a *scire facias* against a patent, the validity of which has been sustained by the House of Lords, is dismissed as vexatious. So the Attorney General admits that if the English practice were followed here, he would be out of court. His bill could not be sustained under the American system of 1793, because that requires proof, not only of invalidity, but also of actual fraud. The American system of 1836 refuses the power altogether. His system therefore is new — without precedent anywhere in the world.

· In 1836 Congress established a new and different patent system. The two essential and novel features of it were, — the examination in the Patent Office, a feature never used anywhere in the world before, which weeds out more than one-third of the applications and prevents many more; and the abolition of all proceedings to cancel, except in the one case of interfering patents, Rev. Stat. § 4918. The Attorney General now wants to add a power more vast than has ever been used in England. But Congress has expressed its views. Many times since 1836, its Commissioners of Patents (Reports for 1856, 1885) and its committees have reported that the power could not be used without specific legislative authority. Everybody has agreed in that view. In 1846, 1848, 1850, 1852, 1854, 1856, 1878, 1882, 1884, (notably in 1850, when Day, wishing a suit to cancel the Goodyear patent, laid before

Congress, and the Senate committee, and the Senate in debate, adopted the opinions of his counsel, Messrs. George Gifford, B. Rand and W. Phillips, that the power did not exist; and therefore he had to ask Congress for legislation,) bills were introduced to authorize proceedings for cancellation, and were all rejected by Congress. The Attorney General now wants to enforce the law which Congress refused to make.

The court has no power to entertain this suit. The judiciary act does not authorize it to exert any prerogative powers not expressly given. This court has also decided that the English prerogative power of the Attorney General cannot be used to repeal any patents, but that land patents can be cancelled only in suits based upon a property interest, and such as a private person could maintain.

The courts have rejected the power as vigorously as Congress has.

Shepley and Knowles, JJ., denied it in 1876 by a very elaborate decision in *Attorney General* v. *Rumford Works*, 2 Ban. & Ard. Pat. Cas. 298, the first attempt ever made to exercise such a power.

Blodgett, J., decided in *United States* v. *Frazer*, 22 Fed. Rep. 106 (1883), that, if it existed at all, it could not be used for grounds of invalidity which could be set up in an infringement suit.

Wallace, J., in *United States* v. *Gunning*, 21 Blatchford, 516, 18 Fed. Rep. 511 (1883), after an argument which did not present the real questions, decided that the bill would lie in a case of fraud. In 1885, in *United States* v. *Colgate*, 22 Blatchford, 412, he decided on demurrer that it would not lie to try defences which had been passed upon in an infringement suit. Such a bill would have no equity to support it.

McKennan, J., in 1883, stayed a bill against the Roberts Torpedo patent, on the ground that it was vexatious to bring it while the patent was before the Supreme Court in an infringement suit.

In England, in the matter of the Neilson Hot-blast Patent, Lord Lyndhurst stayed proceedings in the *scire facias* suit, on the ground that it was vexatious to bring it while the validity

of the patent was before the House of Lords in an infringe-ment case. Webster's Pat. Cas. 665. In the *Queen* v. *Prosser*, 11 Beavan, 306, Lord Langdale agreed that the court had such authority in the *scire facias* proceedings.

The general rule that equity will not interfere against a right which has been sustained whenever tried, at least unless the bill alleges some special reason for such interference, is established by *Miles* v. *Caldwell*, 2 Wall. 34, 39; *Hawes* v. *Oakland*, 104 U. S. 450; *Detroit* v. *Dean*, 106 U. S. 537; *Greenwood* v. *Freight Co.*, 105 U. S. 13; *Dimpfell* v. *Ohio & Mississippi Railroad*, 110 U. S. 209; *Town of Mt. Zion* v. *Gillman*, 9 Bissell, 479; *S. C.* 14 Fed. Rep. 123.

In *Mowry* v. *Whitney*, 14 Wall. 434, and *Rubber Co.* v. *Goodyear*, 9 Wall. 788, and *Bourne* v. *Goodyear*, 9 Wall. 811, the question of power was not raised by the facts, nor argued by counsel, nor decided by the court. But the court, particularly in *Mowry* v. *Whitney*, did declare that no direct suit could be maintained to try any question unless its decision thereon would be binding on the world.

This patent was granted by the Patent Office, a tribunal which is beyond executive control. *Butterworth* v. *Hoe*, 112 U. S. 50. It has been sustained in all the circuits, and by this court. The Attorney General, as Attorney General, cannot even read it or understand it; for this and most other patents require technical knowledge which his office is not furnished with. Yet he asserts that if he is not satisfied with those decisions, he may, not by alleging reasons for dissatisfaction, but simply by his power, *sic volo, sic jubeo*, compel a retrial of the Reis defence and all the other defences that have been passed upon. For that purpose this bill is brought, and the fact that it has been sustained, which is its glory, is here treated as if it were its shame.

*Mr. Chauncey Smith* was with *Mr. Storrow* and *Mr. Dickerson* on their brief.

Mr. Justice Miller delivered the opinion of the court.

This is an appeal from the Circuit Court of the United States for the District of Massachusetts.

The United States brought its suit in equity in that court against the American Bell Telephone Company, a corporation organized under the laws of the State of Massachusetts, and against Alexander Graham Bell, a resident of the District of Columbia. The action purports to have been instituted by George M. Stearns, the United States District Attorney for that district, by the direction of George A. Jenks, the Solicitor General of the United States, acting as its Attorney General in this matter, because the latter officer was under a disability to prosecute this suit.

The object of the bill was to impeach two patents for inventions issued to said Bell, the first dated March 7, 1876, and numbered 174,465, and the second dated January 30, 1877, and numbered 186,787, with a prayer that they be declared void and of no effect, and that they be in all things recalled, repealed and decreed absolutely null; that they be erased and obliterated from the records of the Patent Office; and for other relief.

To this bill the telephone company entered an appearance and filed a demurrer. It is not shown that Bell either appeared or filed any pleading. At the hearing on the demurrer it was sustained by the Circuit Court, the bill dismissed, and the United States has brought the present appeal to reverse that ruling.

The defendant demurs generally to the whole bill, and in that demurrer objects to specific portions of the bill, and it may be very doubtful whether these are not so mixed up in the same pleading as to make the demurrer void, so far as it relates to such parts of it. As the main questions on the demurrer, however, relate to matters which go to the merits of the whole bill, they are probably all that is necessary to consider here. Some of these points of demurrer, although stated as such in a general demurrer, are manifestly only such as could be taken under a special demurrer, and would not, if successful, defeat the entire bill.

The grounds of demurrer which we shall consider in this opinion are as follows:

First. "That the said bill is multifarious, in that it joins

allegations and prayers for relief in respect of patent No. 174,465, dated March 7, 1876, and allegations and prayers for relief in respect of patent No. 186,787, dated January 30, 1877."

Second. The defendant demurs as to each patent specifically, "that the complainant, in and by its said bill, does not show any power or authority, and no power or authority in law exists, in any person or party, or any court, to bring said suit, nor to entertain the same, nor to give the relief therein prayed, nor any relief thereunder or touching the subject matter thereof;" and further, "that the plaintiff, in and by said bill, has not made or stated a case which calls upon or justifies this court, in the exercise of its discretion, to permit this bill to be entertained."

Third. The defendant specially demurs to the bill, "for that it does not set forth any fraud in the procuring of said patents; and for that it does not specifically set forth what acts, if any, the complainant relies on as constituting fraud in procuring said patents; and for that it does not show when, how, from whom, or by what means the complainant first had knowledge or notice of each alleged fact, nor why, with due diligence, it would not have learned them earlier;" and, also, "because the allegations contained in said bill, if true, would not entitle the complainant to the relief prayed for, nor to any relief in a court of equity."

While these grounds of demurrer are stated in the language of the demurrer itself, we have grouped them somewhat differently from the mode in which they are there stated, because we think the consideration of the three causes of demurrer here laid down must dispose of the case before us.

With regard to the question of multifariousness, we do not think it needs much consideration. It is very true that the bill assails two patents, issued nearly a year apart, but they were issued to the same party, Alexander Graham Bell, and relate to the same subject, that of communicating messages at a distance by speech, and by the same general mode, the later patent being supposed to be for an improvement upon the invention of the earlier one. Both are held by the same defend-

ant, the American Bell Telephone Company, and are used by it in the same operations.

The principle of multifariousness is one very largely of convenience, and is more often applied where two parties are attempted to be brought together by a bill in chancery who have no common interest in the litigation, whereby one party is compelled to join in the expense and trouble of a suit in which he and his codefendant have no common interest, or in which one party is joined as complainant with another party with whom in like manner he either has no interest at all, or no such interest as requires the defendant to litigate it in the same action. *Oliver* v. *Piatt*, 3 How. 333 ; *Walker* v. *Powers*, 104 U. S. 245.

In the present case there is no such difficulty. The Bell Telephone Company and Mr. Bell himself are the only parties defendant, and their interest in sustaining the patents is the same. So also there is no such diversity of the subject matter embraced in the assault on the two patents that they cannot be conveniently considered together, and although it may be possible that one patent may be sustained and the other may not, yet it is competent for the court to make a decree in conformity with such finding. It seems to us in every way appropriate that the question of the validity of the two patents should be considered together.

It will be convenient, as a means of showing specifically the ground of complaint in the bill, to take up next the third group of the causes of demurrer. The point intended to be presented there is, that the bill does not set forth any fraud in the procuring of the patents, and does not specifically set forth what acts, if any, the complainant relies upon as constituting fraud in their procurement, and also that the allegations contained in the bill, if true, would not entitle the complainant to the relief prayed for, nor to any relief in a court of equity. Assuming for the present that the Circuit Courts of the United States have the same jurisdiction in equity, in a case where the United States itself is plaintiff that they have where a citizen is plaintiff, to relieve against accident, mistake, fraud, covin and deceit, we proceed to examine into the sufficiency of the allegations in this bill to maintain such a suit.

The fifth claim of invention of the patent of March 7, 1876, which was held to be a sufficient claim for an invention in the recent *Telephone Cases*, decided March 19, 1888, and reported in 126 U. S., is as follows:

" 5. The method of, and apparatus for, transmitting vocal or other sounds telegraphically, as herein described, by causing electrical undulations, similar in form to the vibrations of the air accompanying the said vocal or other sounds, substantially as set forth."

The claims of invention under the patent of January 30, 1877, are eight in number, and may be stated generally to be for improvements in the instruments by which the vocal sounds mentioned in the foregoing paragraph are conveyed and received. The bill alleges that Bell, the patentee, knew at the time of filing his application for the patent of March 7, 1876, that he was not the original and first inventor, as the law required he should be, of all the improvements in telegraphy described and claimed in said specification; " that certain of the so-called improvements had been previously known to and used by others, as is hereinafter more fully and at large set forth; that the said Bell, on the 20th day of January, 1876, and at the time of filing the said application, did not verily believe himself to be the original and first inventor of all the so-called improvements in telegraphy described and claimed in the said specification; and that, on the said 20th day of January, 1876, and at the time of filing the said application, the said Bell did know and did believe that certain of the so-called improvements in telegraphy described and claimed in the specification aforesaid had been previously known to and used by others, as is hereinafter more fully set forth."

It is then charged that the said untrue statements made by said Bell constituted deception and fraud upon the government, and did deceive and defraud complainant, and did cause complainant to issue and deliver said patent, No. 174,465, to said Bell, and that but for said fraudulent statements of said Bell, said patents would not have been issued.

The bill alleges, also, that in his application for the patent, Bell misled the Patent Office by a statement that his invention

was for "an improvement in telegraphy," and especially for a patent for a method of "multiple telegraphy," and that he carefully and intentionally refrained from any expression which would lead to the idea that his invention was to be used as a telephone, or was capable of such use.

The bill then proceeds to describe various discoveries in the art of conveying articulate sounds by telegraphic wires prior to that of Bell, with which it is alleged Bell himself was well acquainted, and which anticipated his discovery, and render his patent void. Among them are those of Philipp Reis of Germany, Elisha Gray of Chicago, and certain fraudulent practices with regard to Gray's claim are charged upon Bell. It is also claimed that Bell was anticipated in the discovery of an electrical speaking telephone by Philipp Reis, Cromwell Fleetwood Varley, Antonio Meucci, Elisha Gray, Thomas A. Edison, Asahel K. Eaton, and many others.

The bill further charges "that said Bell, well knowing that he was not the inventor of the art of transmitting speech by an electric speaking telephone, and also that the patent of March 7, 1876, neither in the drawings, specifications, nor claims of said patent, described any apparatus or device by which articulate speech could be transmitted through the instrumentality of electricity, as perfectly or as well as articulate speech had been transmitted, prior to the alleged said invention, through the instrumentality of electricity, by the use of well-known pre-existing methods and apparatus, sought to fortify himself in his wrongful claim, and more completely to secure to himself the monopoly since alleged by him to be described in said patent, and to further impose upon your orator and the Patent Office, and to that end, on or about January 15, 1877, made another application for a patent to be issued to him, upon which application a patent was issued, No. 186,787, dated January 30, 1877, which said patent purports to be granted to him for a new and useful improvement in electric telegraphy."

It is then charged "that at the time said Bell applied for said last-mentioned patent, he well knew that every material part, portion and device and apparatus set forth and described

in his said patent and specification, were not his invention, but that the several elements, considered either separately or combined, had been taken bodily by him from well-known and existing apparatus, devices and plans invented and contrived by others for the purpose of transmitting articulate speech by means of electricity."

The charge is also made "that he so framed the several claims in said patent, No. 186,787, as on the face thereof to give him and his associates the practical monopoly of well-known and essential devices used and combined in all instruments for the transmission of articulate speech by electricity."

It is also asserted that "said Bell procured his last-named patent by fraud upon one Amos E. Dolbear, Professor of Physics at Tufts College, in Massachusetts," in a manner and under circumstances which are minutely described in the bill.

It seems to us that if Bell was aware, at the time that he filed his specifications, asserted his claims, and procured his patents, that the same matter had been previously discovered and put into operation by other persons, he was guilty of such a fraud upon the public that the monopoly which these patents grant to him ought to be revoked and annulled. We will consider hereafter the power and duty of the court in such a case; at present we are concerned with the sufficiency of the allegations; that is to say, whether the allegation of this fraud is made with such minuteness and sufficiency of detail as to require an answer on the part of the defendants.

The fraud alleged is precisely the fraud which would be committed in a case of that kind. It is a fraud of obtaining a patent for an invention of which the party knew he was not the original inventor. This priority of invention is an essential element; it is absolutely necessary to the right to have such a patent, and can in no case be dispensed with. It may be possible that a patent would not be absolutely void where the patentee was not really the first inventor, and the act of Congress made provision that any man sued for an infringement of such patent might prove that the patentee was not the original discoverer or inventor. But we do not decide here whether a patent is absolutely void because the patentee

is not the first inventor, nor whether a court of equity should set aside a patent where the party had obtained it without fraud or deceit, believing himself to be the first inventor. It is sufficient for the present case, in which, on demurrer, we wish to decide nothing more than is necessary to determine whether the defendants should be called to answer the bill, to say that the charge here is that he knew he was not the first inventor, and that his efforts to procure the patent were fraudulent because he was aware that he was obtaining a patent to which he was not in law or equity entitled.

Nor is the objection to the bill, that it does not allege the facts which constitute the fraud, well taken. The guilty knowledge is well and fully stated, the prior inventions and discoveries and their authors are alleged to have been known to Bell, and are mentioned with sufficient precision, and his connection with some of them, especially in the case of Dr. Gray and others, is set forth with minute particularity. It is a mistake to suppose that in stating the facts which constitute a fraud, where relief is sought in a bill in equity, *all* the evidence which may be adduced to prove that fraud must be recited in the bill. It is sufficient if the main facts or incidents which constitute the fraud against which relief is desired shall be fairly stated, so as to put the defendant upon his guard and apprise him of what answer may be required of him. Story's Equity Pleadings, § 252.

In all these particulars we think the bill is sufficiently explicit. There can be no question that if the bill, as is the general rule on demurrers, is to be taken as true, there is enough in it to establish the fraud in the procurement of the patent, and to justify its cancellation or rescission, if the court has jurisdiction to do so. *Harding* v. *Handy*, 11 Wheat. 103; *St. Louis* v. *Knapp Co.*, 104 U. S. 658.

But the second group of causes of demurrer is perhaps the most important, and the one on which counsel seem to have principally relied, the essence of which is, that "no power or authority in law exists, in any person or party, or any court, to bring said suit, nor to entertain the same, nor to give the relief therein prayed, nor any relief thereunder or touching the

subject-matter thereof," and "that the complainant has not made or stated a case which calls upon or justifies this court in the exercise of its discretion to permit this bill to be entertained."

It will be observed that this broad assertion admits that a party may practise an intentional fraud upon the officers of the government, who are authorized and whose duty it is to decide upon his right to a patent, and that he may by means of that fraud perpetrate a grievous wrong upon the general public, upon the United States, and upon its representatives. It admits that by prostituting the forms of law to his service he may obtain an instrument bearing the authority of the government of the United States, entitling him to a monopoly in the use of an invention which he never originated, of a discovery which was made by others, and which, however generally useful or even necessary it may become, is under his absolute and exclusive control, either as to that use or as to the price he may charge for it during the life of the grant. It assumes that the government, which has thus been imposed upon and deceived, is utterly helpless, and that it can take no steps to correct the evil or to redress the fraud. If such a fraud were practised upon an individual, he would have a remedy in any court having jurisdiction to correct frauds and mistakes and to relieve against accident; but it is said that the government of the United States — the representative of sixty millions of people, acting for them, on their behalf, and under their authority — can have no remedy against a fraud which affects them all, and whose influence may be unlimited.

Though, by the Constitution of the United States, it is declared that "the judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority," and "to controversies to which the United States shall be a party," the argument asserts that the practice of a gross fraud upon the United States, concerning matters of immense pecuniary value, and affecting a very large part of its population, is not a proper question of judicial cognizance. It would be a strange anomaly in a government

organized upon a system which rigidly separates the powers to be exercised by its executive, its legislative and its judicial branches, and which in this emphatic language defines the jurisdiction of the judicial department, to hold that in that department there should be no remedy for such a wrong.

As we shall presently see, this court has repeatedly held, after very full argument, and after a due consideration of the proposition here stated, that in regard to patents issued by the government for lands conveyed to individuals or to corporations, the Circuit Courts of the United States do have jurisdiction to set aside and cancel them for frauds committed by the parties to whom they were issued. This class of cases will be considered further on. It is sufficient to say here that they establish the right of the United States to bring suits in its own courts to be relieved against fraud committed in cases of that class exactly similar to that charged in the present case. And it is also to be observed that in those cases there is no express act of Congress authorizing such procedure, a ground of objection which is here urged.

Recurring to the Constitution itself as the great source of all power in the United States, whether executive, legislative or judicial, there is a striking similarity in the language of that instrument conferring the power upon the government under which patents are issued for inventions, and patents are issued for lands. It is declared in Article 1, Sec. 8, par. 8, that "the Congress shall have power . . . to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." It is by virtue of this clause that Congress has passed the laws under which the patents of the defendant in this case were issued.

Article 4, Sec. 3, par. 2, declares that "the Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." It is under this clause that Congress has passed laws by which title to public lands is conveyed to individuals, by instruments also called patents.

The power, therefore, to issue a patent for an invention, and

the authority to issue such an instrument for a grant of land, emanate from the same source, and although exercised by different bureaux or officers under the government, are of the same nature, character and validity, and imply in each case the exercise of the power of the government according to modes regulated by acts of Congress.

With regard to the jurisdiction of the Circuit Court in which this suit was brought, there does not seem to be any objection made by defendants, if such suit could be brought in any court. Indeed, the language of the act of Congress on that subject does not admit of any such doubt, for it declares " that the Circuit Courts of the United States shall have original cognizance, concurrent with the courts of the several States, of all suits of a civil nature at common law or in equity, where the matter in dispute exceeds, exclusive of costs, the sum or value of five hundred dollars, and arising under the Constitution or laws of the United States, or treaties made, or which shall be made, under their authority, or in which the United States are plaintiffs or petitioners." Act of March 3, 1875, 18 Stat. 470.

In the present case the United States are plaintiffs, and the bill asserts that the suit is one of a civil nature, and of equitable cognizance; and manifestly, if it presents a good cause of action, it arises under the laws and Constitution of the United States. It is, therefore, within the language, both of the Constitution and of the statute conferring jurisdiction on the Circuit Courts. An examination of the specific objections made to the present bill will illustrate and enforce this general view. While it cannot successfully be denied that the general powers of a court of equity include the right to annul and set aside contracts or instruments obtained by fraud, to correct mistakes made in them, and to give all other appropriate relief against documents of that character, such as requiring their delivery up, their cancellation, or their correction, in order to make them conform to the intention of the parties, it would seem to require some special reason why the government of the United States should not be able to avail itself of these powers of a court of equity. Accordingly, the defendant objects, that the

appropriate remedy, if any exists, is in the common-law courts, and not in a court of equity, and that in the ancient proceedings of our English ancestors, in regard to patents, the only remedy for relief against them, when they were improvidently issued, was by a *scire facias* in the name of the king, or by his express and personal revocation of them.

Charters and patents authenticating grants of personal privileges were in the earlier days of the English government made by the crown. They were supposed to emanate directly from the king, and were not issued under any authority given by acts of Parliament, nor were they regulated by any statutes. Being, therefore, in their origin an exercise of his personal prerogative, the power of revoking them, so far as they could be revoked at all, was in the king, and was exercised by him as a personal privilege. This mode of revoking patents, however, seems to have fallen into disuse; and the same end was attained by the issue of writs of *scire facias*, in the name of the king, to show cause why the patents should not be repealed or revoked. These were, of course, returnable into some court; and it appears to have been the practice to do this in the Court of King's Bench, or in the Court of Chancery, where the record of the patent always remained in what was called the petty bag office. If the latter mode is to be considered a proceeding in chancery which, under our adoption of the methods and jurisdiction of the High Court of Chancery in England, would fall within the province of a chancery court in this country, then the precedent for the exercise of this jurisdiction by a Court of Chancery is clear and undoubted. This, however, is a question which, if not in relation to this particular class of cases, has in regard to others, concerning the prerogative jurisdiction of the court of chancery in this country, been doubted. But the courts of England seem to have considered that in the matter of repealing or revoking a patent the king may sue in what court he pleases. See *Magdalen College Case*, 11 Rep. 66 *b*, 68 *b*, and 75 *a*.

The jurisdiction to repeal a patent by a decree of a Court of Chancery as an exercise of its ordinary powers was sustained

in the case of *Attorney General* v. *Vernon*, 1 Vernon, 277. In that action a bill was brought by the Attorney General against Vernon and others to set aside a patent issued by the crown, on the ground that it was obtained by surprise and by false particulars. It was insisted by the defendant's counsel that there never had been any precedent of this nature to repeal letters patent by an English bill in chancery, but that it was a case of first impression; and they contended that the title under the letters patent was one purely at law and returnable there; likewise, that there was a remedy by *scire facias*. It was also objected that the word "fraud," which, if anything, must give jurisdiction to the court in the case, was not in the whole bill. Also, among other things, it was objected, that if letters patent should be impeached by an English bill in chancery upon such suggestions and pretensions as these, no patentee could be safe, nor would the king's seal be of any force. To this it was replied, on the part of the king, that he may sue in what court he pleases; that the bill charges surprise and false particulars, and that fraud is properly relievable here; that the king ought not to be in a worse condition than a subject; that a nobleman would be relieved of such a fraud put upon him by his servant; and that, if the king could not be relieved in this case by an English bill, he would be without remedy. Whereupon the Lord Keeper said: "The question is short, whether there be a fraud, or not? If a fraud, it is properly relievable here. It is not fit such a matter as this should be stifled upon a plea; and therefore the *Lord Keeper* overruled the plea, and denied to save the benefit of it till the hearing, because he would not give any countenance to such a case." p. 282.

So far as precedent is concerned, this case, which has never been overruled, establishes the doctrine that in a case of fraud in the obtaining of a patent, a Court of Chancery, by virtue of that fact, has jurisdiction to repeal or revoke it.

The case of *The King* v. *Butler*, 3 Levinz, 220, which was heard in the House of Lords, was one where the king had made a grant of a market by letters patent to Sir Oliver Butler, the defendant. A writ of *scire f. as* was brought in the

Court of Chancery to repeal the grant, and the Lord Chancellor gave judgment that it should be vacated; whereupon the matter was brought by a writ of error to the House of Lords, and, after argument there, the peers requested the opinion of the judges then attending in Parliament, who all unanimously agreed that the judgment given in chancery ought to be affirmed, and delivered their opinion accordingly. It was objected that the writ did not lie, because there was a remedy by the common law, to wit, by assize of nuisance, where the matter should be tried by a jury, and by several judges, and not by one only, as it is in chancery. To which they answered, that the king has an undoubted right to repeal a patent wherein he is deceived or his subjects prejudiced. And in none of the cases cited was there any question whether the writ would lie, but only the manner of pursuing it, and other incident matters. It was said that it was not unusual for the king to have his remedy as well as the subject also.

The whole text of the answers of the judges in this case seems to imply that a jury was not necessary, but that the existence of the record in the Court of Chancery was a sufficient foundation for the proceeding there, though it might be brought in some other court, when the king had declared the patent forfeited, or when there had been office found. The judgment of the Court of Chancery was therefore affirmed. See on this subject *Queen* v. *Aires*, 10 Mod. 258, 354; *Queen* v. *Eastern Archipelago Co.*, 1 El. & Bl. 310; *Cumming* v. *Forrester*, 2 Jac. & Walk. 334, 341.

But whatever may have been the course of procedure usual or requisite in the English jurisprudence, to enable the king to repeal, revoke or nullify his own patents, issued under his prerogative right, it can have but little force in limiting or restricting the measures by which the government of the United States shall have a remedy for an imposition upon it or its officers in the procurement or issue of a patent. We have no king in this country; we have here no prerogative right of the crown; and letters patent, whether for inventions or for grants of land, issue not from the President but from the United States. The President has no prerogative in

the matter. He has no right to issue a patent, and, though it is the custom for patents for lands to be signed by him, they are of no avail until the proper seal of the government is affixed to them. Indeed, a recent act of Congress authorizes the appointment of a clerk for the special purpose of signing the President's name to patents of that character. And so far as patents for inventions are concerned, whatever may have been the case formerly, since the act of July 8, 1870, they are issued without his signature and without his name or his style of office being mentioned in them. The authority for this procedure is embodied in the following language of the Revised Statutes:

"SEC. 4883. All patents shall be issued in the name of the United States of America, under the seal of the Patent Office, and shall be signed by the Secretary of the Interior and countersigned by the Commissioner of Patents, and they shall be recorded, together with the specifications, in the Patent Office, in books to be kept for that purpose."

This only expresses the necessary effect of the acts of Congress. The authority by which the patent issues is that of the United States of America. The seal which is used is the seal of the Patent Office, and that was created by Congressional enactment. It is signed by the Secretary of the Interior, and the Commissioner of Patents, who also countersigns it, is an officer of that department. The patent, then, is not the exercise of any prerogative power or discretion by the President or by any other officer of the government, but it is the result of a course of proceeding, *quasi* judicial in its character, and is not subject to be repealed or revoked by the President, the Secretary of the Interior, or the Commissioner of Patents, when once issued. See *United States* v. *Schurz,* 102 U. S. 378.

It is not without weight, in considering the jurisdiction of a court of equity in regard to the power to impeach patents, that an appeal is provided from the decision of the Commissioner of Patents to the Supreme Court of the District of Columbia, and that the Revised Statutes enact as follows:

"SEC. 4915. Whenever a patent on application is refused,

either by the Commissioner of Patents, or by the Supreme Court of the District of Columbia upon appeal from the Commissioner, the applicant may have remedy by bill in equity; and the court having cognizance thereof, on notice to adverse parties and other due proceedings had, may adjudge that such applicant is entitled, according to law, to receive a patent for his invention, as specified in his claim, or for any part thereof, as the facts in the case may appear." It is then further provided, that, if the adjudication be in favor of the applicant, it shall authorize the Commissioner of Patents to issue such patent upon the applicant's filing in the Patent Office a copy of the adjudication.

These provisions, while they do not in express terms confer upon the courts of equity of the United States the power to annul or vacate a patent, show very clearly the sense of Congress that if such power is to be exercised anywhere it should be in the equity jurisdiction of those courts. The only authority competent to set a patent aside, or to annul it, or to correct it, for any reason whatever, is vested in the judicial department of the government, and this can only be effected by proper proceedings taken in the courts of the United States.

This subject has been frequently discussed in this court, and the principles necessary to its decision have been well established. The case of *United States* v. *Stone*, 2 Wall. 525, was a bill in chancery brought by the United States, in the Circuit Court for the District of Kansas, to set aside a patent issued by the government to Stone, the defendant. The question of the jurisdiction of the court to entertain such a bill, which was denied by counsel for Stone, was discussed at considerable length in their brief, and in the argument of counsel for the United States the language of Chief Justice Kent, in *Jackson* v. *Lawton*, 10 Johns. 24, was cited to the following effect: "The English practice of suing out a *scire facias* by the first patentee may have grown out of the rights of the prerogative, and it ceases to be applicable with us. In addition to the remedy by *scire facias*, etc., there is another by bill in the equity side of the Court of Chancery. Such a bill was sus-

tained in the case of *The Attorney General* v. *Vernon*, 1 Vernon, 277, to set aside letters patent obtained by fraud, and they were set aside by a decree."

This extract from the brief of counsel in the Stone case is cited to show that the attention of the court was turned to this question, and the language of the opinion, as delivered by Mr. Justice Grier, expresses in sententious terms the result arrived at by this court in regard to this entire question. It is as follows: "A patent is the highest evidence of title, and is conclusive as against the Government, and all claiming under junior patents or titles, until it is set aside or annulled by some judicial tribunal. In England this was originally done by *scire facias*, but a bill in chancery is found a more convenient remedy. Nor is fraud in the patentee the only ground upon which a bill will be sustained. Patents are sometimes issued unadvisedly or by mistake, where the officer has no authority in law to grant them, or where another party has a higher equity and should have received the patent. In such cases courts of law will pronounce them void. The patent is but evidence of a grant, and the officer who issues it acts ministerially and not judicially. If he issues a patent for land reserved from sale by law, such patent is void for want of authority. But one officer of the Land Office is not competent to cancel or annul the act of his predecessor. That is a judicial act, and requires the judgment of a court. It is contended here, by the counsel of the United States, that the land for which a patent was granted to the appellant was reserved from sale for the use of the government, and, consequently, that the patent is void. And although no fraud is charged in the bill, we have no doubt that such a proceeding in chancery is the proper remedy, and that if the allegations of the bill are supported, the decree of the court below cancelling the patent should be affirmed." p. 535.

We cite thus fully from this case because it is the first one in which the question now before us were fully considered and clearly decided. In the previous case of *United States* v. *Hughes*, 11 How. 552, the same question came before the court on demurrer. The court held that the demurrer must

be overruled, saying that it cannot "be conceived why the government should stand on a different footing from any other proprietor." The case afterwards came again before this court, and is reported in 4 Wall. 232, later than the Stone case. The court then said: "It was the plain duty of the United States to seek to vacate and annul the instrument, to the end that their previous engagement might be fulfilled by the transfer of a clear title, the only one intended for the purchaser by the act of Congress." *United States* v. *Hughes*, 4 Wall. 232, 236.

In the case of *Moore* v. *Robbins*, 96 U. S. 530, 533, this court said, in a suit between private citizens, and speaking of the issue of patents by the government: "If fraud, mistake, error, or wrong has been done, the courts of justice present the only remedy. These courts are as open to the United States to sue for the cancellation of the deed or reconveyance of the land as to individuals; and if the government is the party injured, this is the proper course."

In *Moffat* v. *United States*, 112 U. S. 24, a decree of the Circuit Court setting aside a patent as having been obtained by fraud was affirmed; and the same doctrine was reasserted in *United States* v. *Minor*, 114 U. S. 233. Still later, in the case of *Colorado Coal and Iron Co.* v. *United States*, 123 U. S. 307, the right of the court, by a proceeding in equity at the instance of the Attorney General and in the name of the United States, to set aside a patent for land, was fully recognized, and the language used in the case of *United States* v. *Minor*, *supra*, was cited to the following effect: "Where the patent is the result of nothing but fraud and perjury, it is enough to hold that it conveys the legal title, and it would be going quite too far to say that it cannot be assailed by a proceeding in equity and set aside as void, if the fraud is proved and there are no innocent holders for value." p. 243.

The whole question was reviewed at great length by this court at its last term in the case of *United States* v. *San Jacinto Tin. Co.*, 125 U. S. 273, when all the cases above mentioned, and others, were cited and commented upon. The matter is thus summed up in the opinion of the court: "But

we are of opinion that since the right of the Government of the United States to institute such a suit depends upon the same general principles which would authorize a private citizen to apply to a court of justice for relief against an instrument obtained from him by fraud or deceit, or any of those other practices which are admitted to justify a court in granting relief, the government must show that, like the private individual, it has such an interest in the relief sought as entitles it to move in the matter. If it be a question of property, a case must be made in which the court can afford a remedy in regard to that property; if it be a question of fraud, which would render the instrument void, the fraud must operate to the prejudice of the United States; and if it is apparent that the suit is brought for the benefit of some third party, and that the United States has no pecuniary interest in the remedy sought, and is under no obligation to the party who will be benefited to sustain an action for his use; in short, if there does not appear any obligation on the part of the United States to the public, or to any individual, or any interest of its own, it can no more sustain such an action than any private person could under similar circumstances." pp. 285, 286.

This language is construed by counsel for the appellee in this case to limit the relief granted at the instance of the United States to cases in which it has a direct pecuniary interest. But it is not susceptible of such construction. It was evidently in the mind of the court that the case before it was one where the property right to the land in controversy was the matter of importance, but it was careful to say that the cases in which the instrumentality of the court cannot thus be used are those where the United States has no pecuniary interest in the remedy sought, and is also under no obligation to the party who will be benefited to sustain an action for his use, and also where it does not appear that any obligation existed on the part of the United States to the public or to any individual. The essence of the right of the United States to interfere in the present case is its obligation to protect the public from the monopoly of the patent which was procured by fraud, and it would be difficult to find language

more aptly used to include this in the class of cases which are not excluded from the jurisdiction of the court by want of interest in the government of the United States.

. It is insisted that these decisions have reference exclusively to patents for land, and that they are not applicable to patents for inventions and discoveries. The argument very largely urged for that view is the one just stated, that in the cases which had reference to patents for land the pecuniary interest of the United States was the foundation of the jurisdiction. This, however, is repelled by the language just cited, and by the fact that in more than one of the cases, notably in *United States* v. *Hughes, supra,* the right of the government to sustain the suit was based upon its legal or moral obligation to give a good title to another party who had a prior and a better claim to the land, but whose right was obstructed by the patent issued by the United States.

The case of *Mowry* v. *Whitney,* 14 Wall. 434, 439, 440, was a bill in chancery brought by Mowry, in the Circuit Court for the Eastern District of Pennsylvania, against Whitney, charging that Whitney's patent for a mode of annealing and cooling cast-iron car wheels, and an extension of it made by the Patent Office, had been procured by fraud and false swearing, and praying that it and the extension might be declared void, and of no effect. To this bill Whitney demurred. The demurrer was sustained by the court below, and from the decree dismissing the bill Mowry took an appeal to this court, where it was said "that the complainant could not, in his own right, sustain such a suit." In giving its reasons for this, the court said: "We are of opinion that no one but the government, either in its own name or the name of its appropriate officer, or by some form of proceeding which gives official assurance of the sanction of the proper authority, can institute judicial proceedings for the purpose of vacating or rescinding the patent which the government has issued to an individual, except in the cases provided for in § 16 of the act of July 4, 1836. The ancient mode of doing this in the English courts was by *scire facias,* and three classes of cases are laid down in which this may be done." One of these is, "When the king has granted

a thing by false suggestion, he may by *scire facias* repeal his own grant. (Citing 4 Inst. 88; Dyer, 197–8, and 276, 279.) . . . The *scire facias* to repeal a patent was brought in chancery where the patent was of record. And though in this country the writ of *scire facias* is not in use as a chancery proceeding, the nature of the chancery jurisdiction and its mode of proceeding have established it as the appropriate tribunal for the annulling of a grant or patent from the government. This is settled, so far as this court is concerned, by the case of *United States* v. *Stone*, 2 Wall. 525." The opinion then refers to *Attorney General* v. *Vernon* and *Jackson* v. *Lawton*, already cited.

It is said that this language of the court is *obiter*, and does not decide directly that a suit can be brought in chancery to cancel or annul a patent issued by the United States government for an invention. It is true that what the court was called upon to decide was that a private citizen could not bring such suit, but evidently the reason given for it must be held to establish the principle upon which the court acted, and that reason was that the private citizen could not do it because the right lay with the government. The duty and the right of the government to bring an action which would end in the destruction of the patent, and which would thus protect everybody against the asserted monopoly of it was the reason why the private citizen could not for himself bring such a suit.

Another reason given by the court is that the fraud, if one exists, must have been practised on the government, which, as the party injured, is the appropriate party to seek relief, and that a suit by an individual could only be conclusive in result as between the patentee and the party suing, and the patent would remain a valid instrument as to all others; while, if the action was brought by the government, and a decree had to annul the patent, this would be conclusive in all suits founded on the patent. Other reasons were given showing that the United States was the appropriate party to bring such a suit, and that the Circuit Court of the United States, sitting in equity, was the proper tribunal in which to bring it; all tend-

370 OCTOBER TERM, 1888.

ing to show that the reason why a private citizen could not have such relief was that it belonged to the government.

The United States, by issuing the patents which are here sought to be annulled, has taken from the public rights of immense value and bestowed them upon the patentee. In this respect the government and its officers are acting as the agents of the people, and have, under the authority of law vested in them, taken from the people this valuable privilege and conferred it as an exclusive right upon the patentee. This is property, property of a value so large that nobody has been able to estimate it. In a former argument in this court, it was said to be worth more than twenty-five millions of dollars. This has been taken from the people, from the public, and made the private property of the patentee by the action of one of the departments of the government acting under the forms of law, but deceived and misled, as the bill alleges, by the patentee. That the government, authorized both by the Constitution and the statutes to bring suits at law and in equity, should find it to be its duty to correct this evil, to recall these patents, to get a remedy for this fraud, is so clear that it needs no argument; and we think we have demonstrated that the proper remedy is one adopted by the government in this case.

But conceding that, in regard to patents for land, and in reference to other transactions, in which the government is a party, the courts of equity have jurisdiction to correct mistakes, to give relief for frauds, and to cancel contracts and other important instruments, it is said that in reference to patents for inventions and discoveries the acts of Congress have provided another remedy for frauds committed in obtaining them, and for the very class of frauds set up in this bill. Counsel therefore contend that this supersedes all others. This remedy is found in the following provision of the Revised Statutes.

"Sec. 4920. In any action for infringement the defendant may plead the general issue, and having given notice in writing to the plaintiff or his attorney thirty days before, may prove on trial any one or more of the following special matters:

"First. That for the purpose of deceiving the public the description and specification filed by the patentee in the Patent Office was made to contain less than the whole truth relative to his invention or discovery, or more than is necessary to produce the desired effect; or,

"Second. That he had surreptitiously or unjustly obtained the patent for that which was in fact invented by another, who was using reasonable diligence in adapting and perfecting the same; or,

"Third. That it had been patented or described in some printed publication prior to his supposed invention or discovery thereof; or,

"Fourth. That he was not the original and first inventor or discoverer of any material and substantial part of the thing patented; or,

"Fifth. That it had been in public use or on sale in this country for more than two years before his application for a patent, or had been abandoned to the public."

Prior to the year 1836, from the earliest enactments of patent law, certain provisions had been incorporated in that law authorizing a *scire facias* to issue to declare a patent void for want of invention by the patentee, and other matters, which, though instituted by a private individual, was under the control of the official attorneys of the government. This was repealed by the act of 1836, which may be said to be the first real and successful organization of the Patent Office and the system of patent law in the United States. The law on this subject was revised by the act of Congress of July 8, 1870, 16 Stat. 198, and the Revised Statutes of the United States, from which § 4920 is quoted, contain the language applicable to this subject.

The statute of 1836 repealed the provision for a *scire facias.* It is now argued that the repeal of this provision, together with the enactment of the provision of § 4920, shows that the only remedy for the improvident issuing of a patent is to be found in the language of that section. These clauses, while they do not in any general form declare that a person sued for an infringement of a patent may set up as a defence that it was

procured by fraud or deceit, do in effect specify various acts of fraud which the infringer may rely upon as a defence to a suit against him founded upon that instrument. It is, therefore, urged that because each individual affected by the monopoly of the patent is at liberty, when he is sued for using it without license or authority, to set up these defences, the remedy which the United States has under the principles we have attempted to sustain, is superseded by that fact. But a consideration of the nature and effect of these different modes of proceeding in regard to the patent will show that no such purpose can be inferred from these clauses of the act of Congress.

In the first place, the right given to the infringer to make this defence is a right given to him personally, and to him alone, and the effect of a successful defence of this character by one infringer is simply to establish the fact that, as between him and the patentee, no right of action exists for the reasons set up in such defence. But the patentee is not prevented by any such decision from suing a hundred other infringers, if so many there be, and putting each of them to an expensive defence, in which they all, or some of them, may be defeated and compelled to pay because they are not in possession of the evidence on which the other infringer succeeded in establishing his defence. On the other hand, the suit of the government, if successful, declares the patent void, sets it aside as of no force, vacates it or recalls it, and puts an end to all suits which the patentee can bring against anybody. It opens to the entire world the use of the invention or discovery in regard to which the patentee had asserted a monopoly.

This broad and conclusive effect of a decree of the court, in a suit of that character brought by the United States, is so widely different, so much more beneficial, and is pursued under circumstances so much more likely to secure complete justice, than any defence which can be made by an individual infringer, that it is impossible to suppose that Congress, in granting this right to the individual, intended to supersede or take away the more enlarged remedy of the government. Some of these specifications of grounds of defence are not

such as would ordinarily be sufficient in a court of equity to set aside the patent, as "that it had been in public use or on sale in this country for more than two years," or "that it had been patented or described in some printed publication prior to his supposed invention or discovery thereof." It is unnecessary to decide whether these grounds now would be sufficient cause for setting aside a patent in a suit by the United States, but they are not of that general character which would give a court of equity jurisdiction to do that, except as it may be said they are now parts of the general system of the patent law.

A question almost identical with this was made in the House of Peers in the case of *The King* v. *Butler*, 3 Levinz, 220, as to whether the judgment obtained by the king in the Court of Chancery repealed the grant to Butler. It was answered by the judges to some of the objections that "it was not unusual for the King to have his remedy, as well as the subject also; as for batteries, trespasses, etc., the King has a remedy by information and indictment, and the party grieved by his action."

The argument need not be further extended. There is nothing in these provisions expressing an intention of limiting the power of the government of the United States to get rid of a patent obtained from it by fraud and deceit. And although the legislature may have given to private individuals a more limited form of relief, by way of defence to an action by the patentee, we think the argument that this was intended to supersede the affirmative relief to which the United States is entitled, to obtain a cancellation or vacation of an instrument obtained from it by fraud, an instrument which affects the whole public whose protection from such a fraud is eminently the duty of the United States, is not sound.

*The decree of the Circuit Court dismissing the bill of plaintiff is reversed, and the case remanded to that court, with directions to overrule the demurrer, with leave to defendants to plead or answer, or both, within a time to be fixed by that court.*

MR. JUSTICE GRAY was not present at the argument and took no part in the decision of this case.